**Jason Richard ORAM, Petitioner**

v.

**The PEOPLE of the State of Colorado, Respondent.**

No. 09SC224.

Supreme Court of Colorado,
En Banc.

May 16, 2011.

As Modified on Denial of Rehearing
Aug. 1, 2011.

Douglas K. Wilson, Public Defender, Michael C. Mattis, Deputy Public Defender, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Criminal Justice Section, Appellate Division, Denver, Colorado, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

In this case, we examine whether the common law bonding agent's privilege exists in Colorado and, if so, whether it justified petitioner, bonding agent Jason Richard Oram, and his partner and codefendant, bonding agent Devon Scott Weinstein, in entering a home where they believed a bonded individual to be domiciled. We also examine whether there was sufficient evidence to sustain charges of second degree burglary.[1] We hold that the common law bonding agent's privilege does not exist in Colorado and that there is sufficient evidence that Oram and Weinstein knew that their entry into the home was unlawful to sustain charges of second degree burglary. Therefore, we affirm the decision of the court of appeals.

## I. Facts and Proceedings Below

This case arises out of Oram and Weinstein's entry into a residence in pursuit of a bonded individual. Oram now challenges his convictions of second degree burglary and felony menacing arising from this incident.

John Vigil completed a bond application and agreement for a surety bail bond with LaDonna's Bail Bonds ("LaDonna's"). LaDonna's subsequently posted bond for Vigil on a drug charge. After Vigil failed to appear for a scheduled court appearance, Jefferson County issued an arrest warrant and notified LaDonna's of Vigil's failure to appear. Because LaDonna's considered this a

---

1. This Court granted certiorari on two issues:
   1) Whether the court of appeals erred in approving the trial court's affirmative defense instruction concerning the survival, scope, and applicability of a common law bonding agent's privilege, and in its rejection of the petitioner's tendered affirmative defense instructions.
   2) Whether there was sufficient evidence of the petitioner's required knowledge to reach the jury on the charge of burglary.

violation of Vigil's bond agreement, on August 2, 2004, it sent Oram and Weinstein to locate and apprehend Vigil.

LaDonna's gave Oram and Weinstein a copy of its internal file on Vigil on the morning of August 2, 2004. Additionally, Oram and Weinstein obtained a copy of Vigil's file and arrest warrant from the Jefferson County Courthouse. Because of an issue at the courthouse, Oram and Weinstein were unable to obtain a photo of Vigil. Therefore, the only information that Oram and Weinstein had pertaining to Vigil's appearance was a written description stating that he was a five-foot, two-inch Hispanic male weighing 128 pounds with brown hair and brown eyes and that his birthday was February 2, 1948.

Oram and Weinstein first attempted to contact Vigil by phone, using the two numbers that he had provided in his bond application. Both of these numbers, however, were disconnected. Next, at approximately 9 p.m. on August 2, 2004, the same day that they were put on the case, Oram and Weinstein staked out the address listed in Vigil's bond application and in his file from Jefferson County, 1446 King Street in Denver ("King Street Residence").

Although Vigil listed the King Street Residence as his address, Vigil did not actually reside there and had not done so since the early 1980's. The residents of the King Street Residence at that time were: Vigil's brother, Eugene Vigil, who cosigned the bond application; Eugene's daughter, Gina Vigil; Gina's daughter, Zondra Vigil; Zondra's boyfriend, Joe Martinez; and Gina's young niece and nephew. At the time of the alleged burglary, Gina, Zondra, and Martinez ("Inhabitants") were present at the King Street Residence.

Oram and Weinstein spent approximately one hour staking out the King Street Residence. During their surveillance, Zondra noticed Oram shining a light in the window. At that point, Gina, with Martinez closely behind, approached the screen door and saw Weinstein. According to the Inhabitants, Weinstein stated that he was a Denver Police Officer there to investigate a report of a disturbance at that location. After asking Gina's name, Weinstein asked Martinez's

name and Martinez responded "Joe." Then, while Gina had her hand on the latch, Weinstein pulled open the door, causing Gina to fall outside. Oram then entered the home, ordered Martinez to the ground, and handcuffed him.

The Inhabitants provided various descriptions of the incident, stating that at numerous times Oram and Weinstein referred to themselves as police officers and federal agents. Oram and Weinstein also wore necklace badges which the Inhabitants believed were police badges but, in reality, were bounty hunter badges. Additionally, the Inhabitants stated that Oram and Weinstein pointed guns at Gina and Martinez. Oram, on the other hand, testified that he never referred to himself as a law enforcement agent, did not have a gun, and, although he and Weinstein each had tasers, the only time that he was aware that one was pointed at one of the Inhabitants was when Weinstein pointed his taser at Martinez and ordered him to the ground.

Soon after Oram and Weinstein entered the King Street Residence and apprehended Martinez, they realized that Martinez was not John Vigil, removed the handcuffs and asked the Inhabitants where John Vigil could be located. According to Gina, Weinstein gave her a piece of paper with a phone number and the name "Detective Scott." During this exchange, John Vigil's brother, Eugene Vigil, returned to the King Street Residence and, after further conversation, Oram and Weinstein departed. Approximately one hour later, Eugene Vigil called to notify Oram and Weinstein that his brother, John Vigil, was in police custody.

After a jury trial, Oram and Weinstein were convicted of second degree burglary and felony menacing.

## II. Analysis

██ On appeal to this Court, Oram makes three main arguments: (1) that affirmative defense instruction 16 tendered by the trial court and given to the jury was improper because it did not adequately reflect the com-

mon law bonding agent's privilege;[2] (2) that the trial court improperly rejected his and Weinstein's tendered jury instructions regarding consent,[3] immunity,[4] and the bondsman's privilege;[5] and (3) that there was insufficient evidence that Oram and Weinstein knew that entering the King Street Residence was illegal to reach the jury on the charge of burglary.

Because we hold that the common law bonding agent's privilege does not survive in Colorado, affirmative defense instruction 16, as well as the trial court's denial of Oram and Weinstein's tendered instructions regarding the bondsman's privilege and immunity, was proper. Next, because none of the residents living in the King Street Residence consented to Oram and Weinstein's entry, the trial court properly rejected Oram's tendered in-

struction regarding consent. Lastly, even though Oram and Weinstein contend that they entered the King Street Residence believing that they had authority to do so under the common law bonding agent's privilege, there is sufficient evidence on the issue of whether Oram and Weinstein knew their entry into the King Street Residence was unlawful for the issue to reach the jury.

## A. Bonding Agent's Privilege

■ The court of appeals held that the common law bonding agent's privilege survives in Colorado and that affirmative defense instruction 16 adequately articulated the privilege, rendering Oram and Weinstein's tendered jury instruction explaining the privilege and claiming immunity unneces-

---

2. Affirmative Defense Instruction 16 read:
It is an affirmative defense to all the crimes charged in this case if you find that Defendants acted as reasonable bonding agents. The elements of this affirmative defense are:
1. Defendants were acting as authorized agents of a bail bondsman;
2. Defendants reasonably believed John Vigil had violated the conditions of his bond;
3. Defendants reasonably believed John Vigil was at 1446 King Street on August 2, 2004, at approximately 10:00 p.m.; and
4. Defendants acted reasonably in attempting to effect the arrest of John Vigil.
It is the prosecution's burden to prove beyond a reasonable doubt that Defendants were not acting reasonably, by proving beyond a reasonable doubt that one or more of these four elements of this defense did not exist in this case.
Oram also challenges the second part of Instruction 16, arguing that including these factors misled the jury and improperly emphasized certain evidence. The second part of Instruction 16 read:
In deciding whether Defendants acted reasonably in attempting to arrest John Vigil, you must consider all the circumstances surrounding the attempted arrest. These circumstances may include:
a. All the information Defendants had about the whereabouts of John Vigil prior to the attempted arrest.
b. Whether Defendants actually observed John Vigil, or anyone they reasonably believed to be John Vigil, in the residence before they entered it.
c. Whether, and when, Defendants identified themselves as bounty hunters and gave the reason for their presence at the residence.
d. Defendants' conduct during the attempted arrest.

You may give any or all of these factors the weight you decide is appropriate in determining whether Defendants acted reasonably.
Because we only granted certiorari as to the validity of the instruction concerning the survival, scope and applicability of the common law bonding agent's privilege, we need not consider this argument. Furthermore, we must assume that the jury understood that the inclusion of the word "may" indicated that they had discretion over which factors to consider and followed the trial court's instruction to consider all the evidence. *See People v. Moody*, 676 P.2d 691, 697 (Colo.1984).

3. Oram and Weinstein's tendered and rejected instruction regarding consent read:
It is an affirmative defense to the crime of Burglary or to the result thereof that the defendants were given consent and the consent negates an element of that offense and/or the consent precludes the infliction of the harm or evil sought to be prevented by the law defining that offense.

4. Oram and Weinstein's tendered and rejected instruction regarding immunity stated:
It is an affirmative defense to the crime of Burglary that John Vigil granted immunity from criminal liability to the bail bondsman and the defendants, acting as agents of the bondsperson, in his return upon failing to abide by the bail bonding contract. The Defendants acted under the privilege of that immunity when entering the house at 1446 King Street in their efforts to re-arrest John Vigil.

5. The instruction outlining the bonding agent's privilege contained identical language to that described below in *Taylor v. Taintor*, 16 Wall. 366, 83 U.S. 366, 371, 21 L.Ed. 287 (1872).

sary. We hold that the common law bonding agent's privilege does not exist in Colorado. Therefore, the trial court properly dismissed Oram and Weinstein's tendered instructions and, although instruction 16 was unnecessary, any error in its presence inured to the benefit of Oram and Weinstein and was thus harmless.

In *Taylor v. Taintor*, 16 Wall. 366, 83 U.S. 366, 21 L.Ed. 287 (1872), the U.S. Supreme Court articulated as dicta what has come to be known as the common law bonding agent's privilege. *See, e.g., State v. Nugent*, 199 Conn. 537, 508 A.2d 728, 731–32 (1986); *State v. Burhans*, 277 Kan. 858, 89 P.3d 629, 633 (2004); *State v. Tapia*, 468 N.W.2d 342, 343–44 (Minn.Ct.App.1991). The Court stated:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if it cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if *necessary, may break and enter his house for that purpose.* The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.

*Taylor*, 83 U.S. at 371 (emphasis added). Although many other states have recognized and adopted the common law bonding agent's privilege, Colorado has never explicitly recognized its existence outside of its general adoption of the common law.

■ In Colorado, the common law remains valid and in effect unless it is repealed by the General Assembly. § 2–4–211, C.R.S. (2010). We construe such alterations made to the common law by the General Assembly strictly, *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo. 2004), and will only recognize changes that the General Assembly has expressly mandated or necessarily implied by subsequent legislation, *Clancy Sys. Int'l, Inc. v. Salazar*, 177 P.3d 1235, 1237 (Colo.2008). Accordingly, we must look to the Colorado Revised

Statutes to determine if the common law bonding agent's privilege survives in Colorado.

■ The general provisions of the criminal code, read together with the burglary statutes, necessarily imply that the General Assembly intended to abolish the common law bonding agent's privilege. Section 18–1–104(3), C.R.S. (2010), states that common law crimes are abolished in Colorado and that conduct constitutes an offense only if it is defined by statute. Therefore, an act is only criminal if it has been defined by the General Assembly. Further, section 18–1–103(1), C.R.S. (2010), instructs that the criminal code and other Colorado statutes govern the construction and punishment of any defined offense, but also "the construction and application of any *defense* to a prosecution for such an offense." (emphasis added). Thus, all affirmative defenses to crimes must be defined by the General Assembly in the Colorado Revised Statutes.

Burglary is a defined offense in the Colorado Revised Statutes. *See* §§ 18–4–202 to – 204, C.R.S. (2010). Therefore, based on section 18–1–103(1), defenses to burglary must also be defined in the Colorado Revised Statutes. There are, however, no statutes in Colorado that codify the common law bonding agent's privilege as an affirmative defense.

Section 16–4–108(1)(c), C.R.S. (2010), gives a bonding agent authority to seize and surrender a principal. This section, however, merely states that "a surety may seize and surrender the defendant" and, unlike the dicta in *Taylor*, does not give further instruction as to how the bonding agent may do so. Further, the General Assembly has never stated that the right of a surety to seize the defendant is an affirmative defense. *See generally* §§ 18–1–501 to –505, C.R.S. (2010) (principals of criminal culpability); §§ 18–1–701 to –710, C.R.S. (2010) (justification and exemptions from criminal responsibility); §§ 18–1–801 to –805, C.R.S. (2010) (responsibility). Thus, based on section 18–1–103(1)'s requirement that all defenses to defined offenses must be codified in the Colorado Revised Statutes, the common law bonding agent's privilege has not survived and has been abrogated by the General Assembly in the general provisions of the criminal code and the burglary statutes.

■ Because we hold that the common law bonding agent's privilege does not survive in Colorado, the trial court properly denied Oram and Weinstein's challenge to affirmative defense instruction 16 and, in fact, need not have tendered the instruction at all. Because any error in the giving of this instruction inured to the benefit of Oram and Weinstein, this error is harmless. The trial court also properly rejected Oram and Weinstein's tendered instructions defining the common law bonding agent's privilege and stating that bonding agents have immunity from criminal liability. Therefore, we affirm the court of appeals on this issue.

## B. Consent

■ Oram and Weinstein's second tendered jury instruction indicated that consent is an affirmative defense to burglary. Oram alleges that because Vigil's signed bail bond agreement [6] authorized LaDonna's to enter Vigil's place of residence—listed as the King Street Residence—he and Weinstein had contractual authority to enter and the trial court improperly rejected the tendered instruction. Because no one who resided at or had possession of the King Street Residence consented to Oram or Weinstein entering the King Street Residence or to being menaced, we hold that the trial court correctly rejected Oram and Weinstein's tendered jury instruction regarding consent.

■ Only one who has a possessory or ownership interests in a property may consent to the entry of that property. *See People v. Barefield,* 804 P.2d 1342, 1345 (Colo. App. 1990) (citing *Sloan v. People,* 65 Colo. 456, 276 P. 481 (1918)); *see also People v. Hollenbeck,* 944 P.2d 537, 539 (Colo. App. 1996) ("The law of burglary was designed to protect the dweller, and hence, the controlling question is occupancy rather than ownership."). Further, even if a party once had a possessory interest in a property, if that interest has been relinquished, even if reluctantly, that person can no longer consent to

entry of the property. *Hollenbeck,* 944 P.2d at 539 ("Both parties must have understood the possessory interest of one was being relinquished, even if such interest is relinquished begrudgingly or reluctantly."). In this case, John Vigil was the only one to consent to the entry of the King Street Residence. Vigil, however, did not have a possessory or ownership interest in the King Street Residence, and thus he could not consent to the entry. Despite listing the King Street Residence as his address, Vigil had not resided there in many years. Further, although Vigil occasionally received mail at the King Street Residence, Eugene Vigil always returned it to the sender and requested that John Vigil cease using the King Street Residence as his address. Thus, John Vigil did not have the authority to consent to entry of the King Street Residence.[7]

Because the only person who consented to the entry of the King Street Residence was John Vigil, who did not reside at the King Street Residence, did not have a possessory or ownership interest in the King Street Residence, and thus lacked the authority to consent to the entry, the trial court was correct in refusing Oram and Weinstein's tendered jury instruction regarding consent.

## C. Sufficient Evidence

■ Oram also challenges the court of appeals' holding that there was sufficient evidence to support the knowingly element of burglary. Oram contends that he and Weinstein did not know that their entry into the King Street Residence was unlawful. We disagree.

■ A person commits second degree burglary if he *"knowingly* breaks an entrance into, enters unlawfully in, or remains unlawfully after a lawful or unlawful entry in a building or occupied structure with intent to commit therein a crime against another person or property." § 18–4–203(1) (emphasis added). When a statute includes a culpa-

6. The bonding agreement contained nearly identical language to that found in *Taylor.* It stated: "Whenever the SURETY choose to do so, they may seize the principal and deliver him/her up in their discharge ... They ... if necessary, may break and enter his/her house of residence for that purpose."

7. There was also debate as to whether, by acting as a cosigner to the bond, Eugene Vigil consent-

ed to the entry of the King Street Residence. Although the trial judge expressed that Eugene Vigil might have consented to the entry, Eugene Vigil's testimony does not support this finding. Eugene Vigil testified that he had neither seen nor signed the bond application that contained the phrase allowing entry into the King Street Residence. Because the bond application was the sole basis for the affirmative defense of consent, we conclude that Eugene Vigil did not consent to the entry.

ble mental state, that mental state is deemed to apply to every element of the crime unless the General Assembly clearly intended the contrary. § 18–1–503(4). There is no such indication that the General Assembly intended the knowingly standard in the burglary statute to be limited to the phrase "breaks an entrance into." Therefore, a knowingly mental state must apply to each element of the burglary statute.

A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such a nature or that such circumstances exist. § 18–1–501(6). The mental state of knowingly is a subjective rather than an objective standard and does not include a reasonable care standard. *See People v. DeHerrera,* 697 P.2d 734, 741 (Colo.1985). Circumstances where a defendant should reasonably be aware that his conduct is of such a nature or that such circumstances exist are insufficient to fulfill the knowingly mental state. *Id.* at 740–41. Thus, the second degree burglary statute presents the unusual situation where the prosecution must prove that the defendant knowingly entered or remained unlawfully, or, in other words, that the defendant knew his entry was unlawful.[8] *Compare* § 18–4–203(1), *with Cheek v. United States,* 498 U.S. 192, 199–200, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (people are generally presumed to know the law), *and People v. Holmes,* 959 P.2d 406, 414 (Colo.1998) ("Generally speaking, where the law imposes criminal liability for certain conduct, the scienter element requires 'no more than the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.' " (quoting *United States v. Dashney,* 937 F.2d 532, 538 (10th Cir.1991))).

For this issue to reach the jury, there must have been sufficient evidence that Oram and Weinstein subjectively knew that their entry into the King Street Residence was unlawful. This Court reviews questions relating to sufficiency of the evidence de novo. *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005). In so doing, we must view the evidence in the light most favorable to the prosecution and consider whether it is sufficient to support the defendant's guilt beyond a reasonable doubt. *Id.*

Because Oram and Weinstein believed that the common law bonding agent's privilege was in effect, its extinction does not resolve this issue. Nevertheless, we conclude that Oram and Weinstein's use of a ruse indicates that they knew that their entry was unlawful.[9]

The Inhabitants testified that Oram and Weinstein indicated that they were law enforcement agents investigating a claim of disturbance. Further, the Inhabitants testified that Weinstein gave Gina a card with his phone number and the name "Detective Scott" so that she could contact him if she learned of Vigil's whereabouts. Although Oram testified to the contrary, the jury, not this Court, resolves conflicting evidence. *Raleigh v. Performance Plumbing & Heating, Inc.,* 130 P.3d 1011, 1019 (Colo.2006). We believe that using a ruse as authority for entering the King Street Residence presents sufficient evidence that Oram and Weinstein did not believe that they were otherwise authorized to do so. We therefore affirm the court of appeals on this issue.

### III. Conclusion

We hold that the common law bonding agent's privilege articulated in *Taylor* does not exist in Colorado. Therefore, Oram and Weinstein did not have the authority to enter the King Street Residence. Further, we hold that there is sufficient evidence that, despite their reliance on the common law privilege, Oram and Weinstein knew that their entry into the King Street Residence

---

**8.** As a result, the trial court, without objection, instructed the jury that burglary required proof that the defendants "knowingly unlawfully entered or remained unlawfully" in another's residence.

**9.** Oram and Weinstein first argue that they had consent to enter the King Street Residence. But, as discussed *supra,* Part II.B, there was no consent by a victim of the burglary and this argument does not disprove that Oram and Weinstein acted knowingly.

was unlawful. Therefore, we affirm the court of appeals.