2012 COA 50

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Jason William BONDURANT, Defendant–Appellant.**

No. 07CA2481.

Colorado Court of Appeals, Div. I.

March 29, 2012.

Rehearing Denied June 7, 2012.

John W. Suthers, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Cory D. Riddle, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge TAUBMAN.

¶ 1 Defendant, Jason William Bondurant, appeals the trial court's judgment of conviction entered upon jury verdicts finding him guilty of first degree murder after deliberation, second degree murder, first degree felony murder, first degree burglary, false imprisonment, theft, two counts of menacing, and four counts of child abuse.[1] His primary contentions concern the constitutionality of sections 16–8–103.6, 16–8–106, and 16–8–107(3)(b), C.R.S.2011, a statutory scheme requiring defendants wishing to present expert testimony concerning their mental condition to undergo a court-ordered mental examination. His constitutional challenges on separation of powers and vagueness grounds are matters of first impression. We reject Bondurant's constitutional challenges and other contentions and therefore affirm.

## I. Background

¶ 2 Bondurant fathered three sons with his ex-girlfriend, Sarah Cole, before the couple separated. Cole moved to the house of her mother and stepfather, Peggy and Fred Hawkins, with the boys.

¶ 3 During this time, on various occasions, Bondurant arranged with Cole to visit his sons at the Hawkinses' residence.

¶ 4 Sometime after her separation from Bondurant, Cole was briefly hospitalized. Bondurant visited her and, suffering from depression and anxiety attacks, threatened to take his life. He had recently learned that Cole had become intimately involved with a young man, C.R. Bondurant was then detained at the hospital for three days.

¶ 5 Shortly after his release, on August 25, 2007, Bondurant traveled by bus and taxi to visit his children at the Hawkinses' residence. He carried a gun which he had taken from his roommate. Although he spoke with Cole by phone earlier that day, he did not mention his intention to visit. Rather, he told her in a voice message that he would soon leave for Ohio.

¶ 6 A short while later, Bondurant arrived without any notice, and entered the house with the gun in hand.

¶ 7 Bondurant ordered everyone he saw into the living area. Quickly, C.H., Cole's stepbrother, lunged for the gun. It went off, killing C.H. Bondurant then fatally shot C.R. five times. After Bondurant talked with Cole, the police arrived and arrested him.

¶ 8 At trial, Bondurant admitted to fatally shooting the two victims, but denied that he could be convicted of the various charges because he lacked the culpable mental state. In support, Bondurant presented an expert witness in psychiatry who testified that Bondurant was severely depressed and, on the date of the charged offenses, suffered a panic attack which impaired his ability to form the intent to commit those crimes. This evidence and the court-ordered psychiatric examination required prior to its introduction are the focus of this appeal.

¶ 9 The jury found Bondurant guilty as noted above. The trial court sentenced him to two consecutive terms of life in prison without parole for the crimes of murder, to be served concurrently with sentences in the aggregate of sixteen years for the remaining counts. This appeal followed.

## II. Constitutional Challenges

¶ 10 Bondurant contends that the trial court erred in ordering him to undergo a psychiatric examination pursuant to section

---

1. Although Bondurant was convicted of both second degree murder and first degree felony mur- der of one of the victims, C.H., the counts merged at sentencing.

16–8–106 after he proposed to introduce expert testimony on his mental condition because the statutory scheme is unconstitutional. Specifically, he contends that conditioning the introduction of such evidence on a defendant's cooperation with a court-ordered mental health examination and permitting disclosure of information obtained therefrom at trial facially violates the separation of powers doctrine, a defendant's privilege against self-incrimination, the right to present a defense, and the right to effective assistance of counsel, and is unconstitutionally vague both on its face and as applied.[2] For the reasons set forth below, we disagree.

## A. Standard of Review

¶ 11 Whether a statute is constitutional is a question of law that we review de novo. *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 440 (Colo.2000). Because "declaring a statute unconstitutional is one of the gravest duties impressed upon the courts," we presume that the General Assembly comports with constitutional standards in enacting a statute. *Id.*

■ ¶ 12 A party challenging the constitutionality of a statute bears a heavy burden to demonstrate its unconstitutionality beyond a reasonable doubt. *Id.*

■ ¶ 13 If a statute is susceptible of different interpretations, we adopt the one which comports with constitutional standards. *People in Interest of C.M.,* 630 P.2d 593, 594 (Colo.1981).

■ ¶ 14 Generally, a statute is unconstitutional on its face only "if the complaining party can show that the law is unconstitutional in all its applications." *Dallman v. Ritter,* 225 P.3d 610, 625 (Colo.2010) (noting an exception in the First Amendment free speech context). Even a facially constitutional statute may be held unconstitutional as applied to an individual under the circumstances in which he or she has acted or proposed to act. *Sanger v. Dennis,* 148 P.3d 404, 410–11 (Colo.App.2006) (a statute held unconstitutional as applied may not be applied in a similar context, but is not rendered entirely inoperative).[3]

## B. Separation of Powers

¶ 15 Bondurant contends, as a matter of first impression, that section 16–8–107(3)(b) is unconstitutional on its face because it violates the separation of powers doctrine of the Colorado Constitution. He contends it constitutes a purely procedural statute and thus usurps the judiciary's exclusive rulemaking power. Alternatively, he maintains, even if the rule does not invade the judiciary's sole province, it substantially conflicts with Crim. P. 11(e) and Crim. P. 16, part II, and thus with the judiciary's powers. We are not persuaded.

■ ¶ 16 The Colorado Constitution divides the powers of government into three branches: legislative, executive, and judicial. Colo. Const. art. III. The doctrine of separation of powers generally prohibits one branch from exercising powers that the constitution exclusively vests in another branch. *Crowe v. Tull,* 126 P.3d 196, 205 (Colo.2006).

■ ¶ 17 Colorado Constitution article VI, section 21 vests the supreme court with the power to "make and promulgate rules gov-

---

2. On appeal, Bondurant also raises, in a cursory fashion, numerous other constitutional violations caused by the application of these purportedly facially unconstitutional statutes, including: the rights to testify, to equal protection, to require the state to prove every element of the charges beyond a reasonable doubt, to be free from cruel and unusual punishment, and "to be free from having to choose to exercise one constitutional right at the cost of forfeiting another." He alleged these violations to the trial court in a similarly cursory fashion. Accordingly, we decline to address them here. *See People v. Mershon,* 874 P.2d 1025, 1035 n. 13 (Colo.1994) (arguments raised in a cursory fashion before the trial court and court of appeals are not addressed).

3. Although Bondurant asserts that is he making both facial and as-applied challenges for each constitutional issue, except as to arguments that the statute is unconstitutionally vague, he does not articulate any basis for the as-applied challenges and so we do not address them. *See, e.g. Crocker v. Colorado Dep't of Revenue,* 652 P.2d 1067, 1071 (Colo.1982) (where the parties have not briefed issues, "elect[ing] not to address [them] in absence of a full adversary presentation").

erning the administration of all courts and ... governing practice and procedure in civil and criminal cases." Rules adopted for the purpose of encouraging courts to function efficiently are procedural and generally fall within the inherent rulemaking power of the judiciary. *People v. Wiedemer*, 852 P.2d 424, 436 (Colo.1993). In contrast, the General Assembly has the power to enact statutes "directed to substantive matters" relating to public policy. *Id.*

¶ 18 In that regard, the power to define criminal conduct and to establish the legal components of criminal liability is vested with the General Assembly, which "is also empowered to formulate principles of criminal responsibility and justification and, within constitutional limitations, to restrict defenses to particular crimes." *People v. Low*, 732 P.2d 622, 627 (Colo.1987); *see also People v. Quick*, 713 P.2d 1282, 1287 (Colo.1986) (General Assembly may limit affirmative defenses to a particular category of crimes without offending due process). Thus, the General Assembly may establish affirmative defenses and limit the circumstances in which they apply, as long as they do not intrude on other constitutional protections. *Id.*

¶ 19 The separation of powers doctrine "does not require a complete division of authority among the three branches, however, and the powers exercised by different branches of government necessarily overlap." *Crowe*, 126 P.3d at 205–06 (quoting *Dee Enters. v. Indus. Claim Appeals Office*, 89 P.3d 430, 433 (Colo.App.2003)). The authority of the judicial and legislative branches commonly overlaps because the distinction between procedural rules and substantive law is often blurred. *See Wiedemer*, 852 P.2d at 436 (holding that statutes of limitation, although indirectly affecting court procedure, primarily concerned a matter of public policy); *People v. McKenna*, 196 Colo. 367, 371, 585 P.2d 275, 277 (1978) (rape shield statute was neither purely procedural nor purely substantive, but " 'mixed' in nature").

¶ 20 Section 16–8–107(3)(b) provides, in relevant part:

[A] defendant shall not be permitted to introduce evidence in the nature of expert opinion concerning his or her mental condition without having first given notice to the court and the prosecution of his or her intent to introduce such evidence and without having undergone a court-ordered examination pursuant to section 16–8–106.... Such notice shall be given at the time of arraignment; except that the court, for good cause shown, shall permit the defendant to inform the court and prosecution of the intent to introduce such evidence at any time prior to trial.

Although Bondurant contends that this statute is purely procedural, and therefore entirely within the rulemaking authority of the courts, we are not persuaded.

¶ 21 In *Gray v. District Court*, 884 P.2d 286 (Colo.1994), the supreme court discussed the legislative history of section 16–8–103.6, C.R.S.2011, concerning waiver of the claim of confidentiality or privilege for criminal defendants using insanity or impaired mental condition as a defense. The *Gray* court noted that the General Assembly's purpose in requiring court-ordered psychiatric examinations was to prevent defendants from manipulating the system and "to get at the truth" of an insanity defense or impaired mental condition defense. *Id.* at 291 (quoting Dep. Dist. Atty. Dan May, Hearing on H.B. 87–1233 Before the S. Comm. on Judiciary, 56th Gen. Assemb., 1st Sess. (Apr. 1, 1987)).

¶ 22 This rationale of full disclosure similarly applies in situations in which defendants raise other mental conditions to aid in their defense. *See People v. Herrera*, 87 P.3d 240, 247 (Colo.App.2003) (noting that the provision precluding defense expert testimony on mental condition unless the defendant cooperates with compulsory mental examination "is simply another means to discourage defendants from raising an insanity defense and then refusing to cooperate in the testing process that is necessary to determine the validity of the defense"); *see also City & County of Denver v. Casados*, 862 P.2d 908, 914 (Colo.1993) (construing provisions in the context of the statute as a whole). Accordingly, we conclude that the statute, although affecting the procedure of the courts, also concerns the public policy of full disclosure in

criminal cases involving a defense based on a defendant's mental condition.

¶ 23 Having determined that section 16–8–107(3)(b) is "mixed in nature," we address Bondurant's alternative contention, that it impermissibly conflicts with Crim. P. 11(e) and Crim. P. 16, part II.

¶ 24 "[O]verlap between judicial rulemaking and legislative policy is constitutionally permissible so long as [it] does not create a substantial conflict." *Crowe*, 126 P.3d at 206; *see McKenna*, 196 Colo. at 371, 585 P.2d at 277. No such conflict exists in the absence of a procedure conflicting with that set forth in the statute. *McKenna*, 196 Colo. at 372, 585 P.2d at 278 (rape shield statute held constitutional because no rule requiring, nor conflicting with, the procedure set forth in the statute existed).

¶ 25 Although Crim. P. 11(e) requires a criminal defendant pleading not guilty by reason of insanity (NGRI) to so plead at the arraignment or else waive the defense, it nonetheless preserves a defendant's right to otherwise introduce "evidence of mental condition ... as bearing upon the capacity of the accused to form specific intent essential to the commission of a crime." Crim. P. 11(e)(1). While Bondurant maintains that section 16–8–107(3)(b)'s procedure conflicts with Rule 11's lack of any qualification for the introduction of evidence of mental condition, we disagree. Rather, we conclude that the very absence of specific procedure in Crim. P. 11(e) refutes the existence of a substantial conflict between it and section 16–8–107(3)(b). *See McKenna*, 196 Colo. at 372, 585 P.2d at 278.

¶ 26 Nor are we persuaded that section 16–8–107(3)(b) substantially conflicts with Crim. P. 16, part II. The general requirement that defendants disclose expert witnesses and their reports to the prosecution, Crim. P. 16(II)(b), does not preclude the legislature from placing more rigorous demands for public policy reasons on defendants who raise their mental condition as a defense. *See Crowe*, 126 P.3d at 206 (noting that a more specific statute preempts a general statute).

¶ 27 Accordingly, because we conclude that section 16–8–107(3)(b) does not violate the separation of powers doctrine, the trial court did not err in applying it.

## C. Void for Vagueness

¶ 28 Bondurant next contends that section 16–8–107(3)(b), and relevant portions of sections 16–8–103.6 and 16–8–106, are unconstitutionally vague, both facially and as applied to him, because the statutory scheme fails to apprise defendants of what mental conditions trigger its application and to what extent they must cooperate in compulsory examinations to comply therewith. We disagree on this issue of first impression.

¶ 29 "A statute that forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to its application violates due process protections afforded by the United States and Colorado Constitutions." *Watso v. Colorado Dep't of Soc. Services*, 841 P.2d 299, 309 (Colo.1992) (holding that certain statutory child protection standards governing administrative determinations were not unconstitutionally vague).

¶ 30 Because statutes generally "contain broad terms to ensure their applicability to varied circumstances," however, "neither scientific nor mathematical certainty is required." *Id.* In accordance with our presumption that a statute is constitutional, we accord words and phrases their ordinary meaning, construe the provision as a whole in the context of the entire statute, and adopt a constitutional interpretation if one exists. *See Casados*, 862 P.2d at 914; *accord Kruse v. Town of Castle Rock*, 192 P.3d 591, 597 (Colo.App.2008).

### 1. "Mental Condition"

¶ 31 Bondurant contends that section 16–8–107(3)(b)'s provision for criminal defendants attempting to introduce expert testimony concerning their mental condition is unconstitutionally vague on its face because it is unclear whether a "mental condition" includes only mental illnesses, or otherwise encompasses developmental disabilities

and defendants' other mental states at the time of the commission of the alleged offense. We reject this contention.

¶ 32 Under a facial challenge, a plaintiff must show, beyond a reasonable doubt, that a statute is incomprehensible in *all* its applications. *People v. Shell*, 148 P.3d 162, 172 (Colo.2006).

¶ 33 Even if we were to assume that section 16–8–107(3)(b) is unconstitutionally vague for defendants who have developmental disabilities or had some other mental condition during the commission of the crime, we cannot conclude that the statute is unconstitutionally vague with regard to defendants with mental illnesses.

¶ 34 Mental illnesses fall within the ordinary meaning of the term "mental condition." *See, e.g., People v. Roadcap*, 78 P.3d 1108, 1112 (Colo.App.2003) (concluding that a mental illness listed in *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) was a mental condition triggering section 16–8–107(3)(b)); *see also In re People v. Wilburn*, 2012 CO 21, ¶ 28, 272 P.3d 1078 (when a defendant's expert intends to testify that a defendant possesses a learning disorder, the requirements of section 16–8–107(3)(b) are triggered). In closing argument, Bondurant conceded that that he suffered from "two significant mental illnesses," the existence of which were the basis for his only defense to the charged offenses.

¶ 35 Accordingly, because Bondurant has not satisfied his burden to prove beyond a reasonable doubt that the statute is incomprehensible in all applications, his facial challenge to the statute based on ambiguity of the term "mental condition" necessarily fails.

¶ 36 Furthermore, because Bondurant has not alleged that he was developmentally disabled at the time he committed the crimes with which he was charged, we also reject his contention that the statute was unconstitutional as applied to him. *See Sanger*, 148 P.3d at 411 (in as-applied challenge, statute must be unconstitutional in the circumstances in which the plaintiff has acted or proposed to act).

¶ 37 Rather, Bondurant sought to introduce expert testimony concerning his mental health when the crime was committed, including the existence of clinical depression, anxiety disorder, and multiple personality disorder. A person of common intelligence would consider these conditions mental illnesses. *Roadcap*, 78 P.3d at 1112. We also conclude that the context of the insanity statutes, in which "impaired mental condition" is a specifically defined subset of the broader term "mental condition," further notified Bondurant that attempting to introduce expert testimony concerning his particular mental health history would expose him to compulsory examination and cooperation requirements. *See* § 16–8–102, C.R.S.2011. Bondurant therefore has not proven that the statute is unconstitutionally vague as applied to him.

## 2. "Cooperate"

¶ 38 Bondurant also contends that section 16–8–106(2)(c), C.R.S.2011, and by extension section 16–8–107(3)(b), are unconstitutionally vague because they fail to define the term "cooperate." We disagree.

¶ 39 To introduce expert testimony concerning mental condition under section 16–8–107(3)(b), a criminal defendant must undergo a court-ordered examination and cooperate therewith pursuant to section 16–8–106. The section provides in relevant part:

> The defendant shall cooperate with psychiatrists and other personnel conducting any examination ordered by the court pursuant to this section.... If the defendant does not cooperate with psychiatrists and other personnel conducting the examination, the court shall not allow the defendant to call any psychiatrist or other expert witness to provide evidence at the defendant's trial concerning the defendant's mental condition.... In addition, the fact of the defendant's noncooperation with psychiatrists and other personnel conducting the examination may be admissible in the defendant's trial to rebut any evidence introduced by the defendant with regard to the defendant's mental condition....

§ 16–8–106(2)(c).

¶ 40 Bondurant provides no specific basis for concluding that a person of ordinary in-

telligence would have to guess at the common meaning of the term "cooperate." *See C.M.*, 630 P.2d at 594 (adopting the constitutional interpretation of a statute susceptible of different meanings); *Webster's Third New International Dictionary* 501 (2002) ("cooperate" connotes "to act or work together with another or others to a common end"). Nor has he alleged that the term was incomprehensible to him before or during his court-ordered examination. *See Sanger*, 148 P.3d at 411. Accordingly, we reject his contention that the lack of a definition for the term "cooperate" renders these provisions unconstitutionally vague on their face.

### D. Self–Incrimination

¶ 41 Bondurant also maintains that sections 16–8–103.6(2), 16–8–106(2)(c), (3)(b)-(c), and 16–8–107(1.5)(a), (3)(b), C.R.S.2011, violate a defendant's constitutional privilege against self-incrimination because they require a defendant to make involuntary, unprivileged statements concerning his or her mental state in a compulsory mental examination. We perceive no violation.

¶ 42 Section 16–8–107(3)(b) requires a court-ordered mental examination in the circumstances discussed above pursuant to section 16–8–106. Under this latter section, a defendant must cooperate during the examination, or else be precluded from presenting expert testimony concerning his or her mental condition. § 16–8–106(2)(c). Personnel conducting a court-ordered examination of a noncooperative defendant may also testify as to the defendant's noncooperation, statements, and medical and social history to rebut evidence presented by the defendant about his or her mental condition. § 16–8–106(2)(b), (3)(b)-(c). Section 16–8–107(3)(b) also reaffirms the application of section 16–8–103.6 to court-ordered examinations concerning mental conditions, providing that a defendant is deemed to have waived his or her physician-patient privilege as to examination communications.

¶ 43 The Fifth Amendment of the United State Constitution and article II, section 18, of the Colorado Constitution protect criminal defendants from being compelled to testify against themselves.

¶ 44 Divisions of this court have consistently held that "the privilege against self-incrimination is not implicated by a court-ordered mental examination when the information obtained therefrom is admitted only on the issue of mental condition." *Herrera*, 87 P.3d at 245 (evidence derived from court-ordered examinations concerning a defendant's capacity to form the requisite mental state is constitutionally admissible); *see People v. Galimanis*, 765 P.2d 644, 647 (Colo.App.1988) (only compulsion of evidence on the issue of guilt implicates a defendant's privilege against self-incrimination); *see also People v. Tally*, 7 P.3d 172, 182–83 (Colo.App.1999) (a psychiatrist's testimony at a unitary trial on defendant's silence during a sanity exam did not violate Fifth Amendment).

¶ 45 Here, this statutory scheme evinces the General Assembly's intent that information obtained in compulsory mental examinations be admissible only on the issue of mental condition. In section 16–8–106(2)(a) and (b), C.R.S.2011, applicable to offenses committed prior to July 1, 1995 and July 1, 1999, respectively, the General Assembly expressly granted defendants raising the defenses of insanity or impaired mental condition "a privilege against self-incrimination during the course of a [court-ordered] examination." In expanding the statutory scheme to encompass other mental conditions, the General Assembly added section 16–8–106(2)(c). There, it replaced the express protection against self-incrimination with the provision that "[s]tatements made by the defendant in the course of [an] examination shall be protected as provided in section 16–8–107." *See also Herrera*, 87 P.3d at 247 ("the fact that § 16–8–106(2)(c) fails to mention the privilege against self-incrimination does not mean it has abolished that protection").

¶ 46 Under section 16–8–107, evidence acquired for the first time "from a communication derived from the defendant's mental processes during the course of a court-ordered mental examination" is not admissible against the defendant on issues raised by a not guilty plea, but rather is only admissible on the issue of insanity in a NGRI plea or as to the defendant's mental condition. § 16–8–107(1)(a), (1.5)(a), C.R.S.2011. These sec-

tions thus limit the admission of information obtained in court-ordered examinations to the issues of mental condition and insanity which defendants themselves have raised. *Cf. Herrera*, 87 P.3d at 251 (testimony implicating defendant's culpability, not just his capacity to form mental state at issue, was improperly admitted).

¶ 47 Nor are we persuaded that section 16–8–106(2)(c)'s preclusion of expert testimony concerning a defendant's mental condition by noncooperative defendants impermissibly penalizes defendants who invoke their privilege against self-incrimination. Nothing in this section allows a court to strike a noncooperative defendant's NGRI plea, or preclude his or her defense of an impaired mental condition or another mental condition. *See French v. District Court*, 153 Colo. 10, 14, 384 P.2d 268, 270 (1963); *Herrera*, 87 P.3d at 247; *Roadcap*, 78 P.3d at 1113 (trial court did not preclude mental condition defense). Accordingly, we reject Bondurant's contention that section 16–8–106 compels defendants to make involuntary statements during court-ordered examinations. *Herrera*, 87 P.3d at 246–48.

¶ 48 Given our conclusions that a defendant raising his or her mental condition as a defense cannot be compelled to make involuntary statements in the compulsory examination, we also reject Bondurant's contention that section 16–8–103.6(2)'s waiver of confidentiality regarding communications made by the defendant during the examination violates his or her privilege against self-incrimination.

¶ 49 Having thus concluded that compulsory examinations under 16–8–106 and disclosure provisions of 16–8–103.6 and 16–8–107 comport with defendants' constitutional privilege against self-incrimination, we discern no error in the trial court's application of this statute.

## E. Right to Present a Defense

¶ 50 Bondurant also contends that sections 16–8–103.6(2), 16–8–106(2)(c), (3)(b)-(c), and 16–8–107(1.5)(a), (3)(b), taken together, violate a defendant's constitutional right to due process because they prohibit calling witnesses to establish a defense. We disagree.

¶ 51 In *Roadcap*, 78 P.3d at 1112, a division of this court addressed the defendant's contention that requiring him to comply with the provisions of section 16–8–107(3)(b) deprived him of his right to present a defense. It concluded that "[t]he court did not preclude this line of defense, but only required defendant to comply with the statute if he chose to pursue it." 78 P.3d at 1112; *see also Herrera*, 87 P.3d at 247 (affirming that a noncooperative defendant does not lose right to bring defense of mental condition, despite lack of expert witness testimony).

¶ 52 We agree with the reasoning and analysis in *Roadcap* and conclude it is dispositive of Bondurant's contention.

## F. Right to Effective Assistance of Counsel

¶ 53 Bondurant next contends that sections 16–8–103.6(2), 16–8–106(2)(c), (3)(b)-(c), and 16–8–107(1.5)(a), (3)(b), violate a defendant's constitutional right to effective assistance of counsel. We are not persuaded.

¶ 54 The Sixth Amendment to the United States Constitution and article II, section 16, of the Colorado Constitution guarantee a criminal defendant the right "to receive the reasonably effective assistance of an attorney acting as his diligent and conscientious advocate." *Davis v. People*, 871 P.2d 769, 772 (Colo.1994).

¶ 55 Bondurant contends that the statutory scheme deprives a defendant of this right because it limits his or her counsel's right to present a defense. Having concluded, consistently with *Roadcap*, that the statutory scheme does not preclude a defense involving the defendant's mental condition, it necessarily follows that the statutory scheme does not violate a defendant's right to effective assistance of counsel. *Roadcap*, 78 P.3d at 1112 (disposing of defendant's arguments that statutory scheme violated right to present a defense and to effective assistance of counsel on same grounds); *see also Gray*, 884 P.2d at 294 (rejecting claim that section 16–8–103.6

disclosure requirement infringed defendant's right to effective assistance of counsel).[4]

¶ 56 Bondurant also contends, without presenting an analytical basis for reaching his conclusion, that the statutes prevent defense counsel from adequately knowing and thus apprising a defendant of the consequences of submitting to a court-ordered examination and going forward at trial with a mental condition defense. Because Bondurant has not presented a persuasive reason to interpret the statutory scheme as unconstitutional on this basis, we deny his contention. *See City of Greenwood Village,* 3 P.3d at 440 ("To declare an act of the legislature unconstitutional is always a delicate duty, and one which courts do not feel authorized to perform, unless the conflict between the law and the constitution is clear and unmistakable.") (quoting *People v. Goddard,* 8 Colo. 432, 437, 7 P. 301, 304 (1885)).

### III. Sufficiency of Evidence on Burglary and Felony Murder Convictions

¶ 57 Bondurant next contends there was insufficient evidence to support a finding beyond a reasonable doubt that he had unlawfully entered or remained in the Hawkinses' home, an element material to first degree burglary and felony murder based thereon. We discern no such error.

### A. Standard of Review

¶ 58 When faced with a challenge based on the sufficiency of the evidence, we view the relevant evidence as a whole and in the light most favorable to the prosecution and determine whether the record sufficiently supports a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt. *People v. Carlson,* 72 P.3d 411, 416 (Colo.App.2003). "Where reasonable minds could differ, the evidence is sufficient to sustain a conviction." *Id.*

### B. Analysis

¶ 59 As relevant here, a person commits first degree burglary if he or she knowingly enters unlawfully, or remains unlawfully after a lawful or unlawful entry, in a building or occupied structure with the intent to commit a crime therein against another person or property, and while in the building or structure, assaults or menaces any person or carries a deadly weapon. § 18–4–202, C.R.S. 2011. The prosecution must prove each element beyond a reasonable doubt to sustain a conviction of burglary. *See, e.g., People v. Lucas,* 232 P.3d 155, 162 (Colo.App.2009).

¶ 60 Conviction of felony murder based upon a victim's death during a burglary requires proof of the same elements essential to the predicate charge of burglary. *See* § 18–3–102(1)(b), C.R.S.2011; *People v. Bartowsheski,* 661 P.2d 235, 246 (Colo.1983).

¶ 61 Bondurant maintains that, because the record demonstrates that the Hawkinses had extended him an open invitation to visit his children on their property, there was insufficient evidence to establish the element of trespass and therefore to sustain his convictions. We disagree.

¶ 62 "A person 'enters unlawfully' or 'remains unlawfully' in or upon premises when he is not licensed, invited, or otherwise privileged to do so." *People v. Waddell,* 24 P.3d 3, 5 (Colo.App.2000); *see* § 18–4–201(3), C.R.S.2011.

¶ 63 Here, Mr. Hawkins testified that, although Bondurant had visited his children at the Hawkinses' residence prior to the date of the offenses and was encouraged to see his children, he "never came in unless we had prior arrangements [and] somebody came [to] pick him up—he never came on his own and just entered the house." Mr. Hawkins also testified that, to his knowledge, Bondurant was not invited to the birthday party on the date of the charged offenses. Cole, Mr. Hawkins, and another witness testified, however, that on that day, Bondurant entered the house unexpectedly, without prior arrangements, and with a gun in hand.[5] Based

---

4. We note, however, that Bondurant has not articulated a reasoned basis for his cursory contention that a defendant's rights are violated by the waiver of privilege under section 16–8–103.6.

5. Mr. Hawkins additionally testified that one of Bondurant's sons stated, in an excited utterance, that his father had arrived with a gun. The trial court admitted this evidence.

on this evidence viewed in the light most favorable to the People, we conclude that the jury could reasonably infer that Bondurant did not have permission from the Hawkinses to enter their property on the date of the charged offenses. *See, e.g., People v. Horne,* 619 P.2d 53, 58 (Colo.1980) (after hearing owner testify concerning defendants' permission to enter her property, it was "within [jury's] prerogative" to determine whether the defendants had trespassed).

¶ 64 Accordingly, we deny Bondurant's contention that insufficient evidence existed to support his convictions of first degree burglary and felony murder.

### IV. Jury Instructions

¶ 65 Bondurant also contends that the trial court erred in refusing to provide the jury with the supplemental instructions he tendered concerning the elements of intent and trespass for the burglary charge. Again, we disagree.

### A. Standard of Review

¶ 66 We view jury instructions as a whole to determine whether the jury was adequately informed of the applicable law. *People v. Whittiker,* 181 P.3d 264, 276 (Colo. App.2006). We also consider whether defense counsel's closing argument communicated the defendant's theory of the case. *Id.*

¶ 67 If the jury is adequately instructed on the law, we will not disturb a trial court's ruling concerning a jury instruction absent an abuse of discretion. *People v. Jones,* 990 P.2d 1098, 1107 (Colo.App.1999).

### B. Analysis

¶ 68 The trial court instructed the jury, in relevant part, that finding Bondurant guilty of first degree burglary required a finding that the People proved beyond a reasonable doubt the material elements of the crime:

(1) that the defendant, (2) in the State of Colorado ..., (3) knowingly, (4) unlawfully entered or remained in a building or occupied structure, (5) with intent to commit therein the crime of menacing ..., and (6) while in the building or occupied structure the defendant menaced ... any person.

¶ 69 However, the trial court did not provide the jury with these additional instructions tendered by Bondurant:

In order to be convicted of burglary, the prosecution must prove beyond a reasonable doubt that the Defendant made up his mind to commit a crime at the point he became a trespasser.

In order to be convicted of burglary, the Defendant must have had the intent to commit a specific crime at the very time and place of trespass. The intent to commit the crime must co-exist with the manner of trespass, as defined in Instruction No.——.

A previously granted authority to enter a premise must be withdrawn before a person so authorized can be convicted of burglary.

Entering a premise with the intent to commit a crime does not make the entry unlawful. [sic]

¶ 70 In tendering the latter two instructions, Bondurant apparently suggested to the jury that it could find he had unlawfully entered or remained on the Hawkinses' premises merely because he possessed and used a deadly weapon thereon, even if it found that he otherwise had permission to be on the premises. Rather, his theory of the case was that, if he had permission to enter, that permission had to be withdrawn for a finding of trespass.

¶ 71 A trial court is not required to give an instruction that is encompassed in the court's other instructions. *People v. Welsh,* 176 P.3d 781, 787 (Colo.App.2007). As relevant here, one jury instruction defined "unlawfully enters or remains" to mean "that a person enters or remains in or upon premises when he is not licensed, invited, or otherwise privileged to do so." *See* § 18–4–201(3). We conclude that Bondurant's tendered instructions, requiring a finding of trespass only in the absence of permission, were encompassed within this instruction and the general burglary instruction.

¶ 72 Additionally, in closing argument, Bondurant clearly articulated his theory that the jury could not find him guilty because he

"had permission to be at [the Hawkinses' home] and at no point was that permission ever taken back or rescinded." *See People v. Smith*, 77 P.3d 751, 757 (Colo.App.2003) (where defendant argued his theory of the case in closing argument, jury was adequately instructed on content of omitted tendered jury instruction).

¶ 73 Accordingly, we conclude that the trial court's instruction on this element was adequate and not an abuse of discretion.

■■■ ¶ 74 Bondurant also contends that the trial court erred in refusing to give his first two tendered instructions. He cites *Cooper v. People*, 973 P.2d 1234, 1241 (Colo. 1999), for the proposition that "a conviction for burglary requires proof that the defendant intended to commit a crime inside at the moment he first became a trespasser." However, the General Assembly amended section 18-4-202 soon after *Cooper* was decided. Ch. 113, sec. 2, 1999 Colo. Sess. Laws. 327. Subsequently, to commit first degree burglary a person had to "knowingly enter[ ] unlawfully, or remain[ ] unlawfully *after a lawful or unlawful entry*, in a building or occupied structure with intent to commit therein a crime." § 18-4-202(1), C.R.S.2011 (emphasis added).

¶ 75 We agree with other divisions of this court that the 1999 amendments legislatively overruled *Cooper* with respect to the intent element of burglary. *People v. Oram*, 217 P.3d 883, 892 (Colo.App.2009) ("[i]ntent to commit a crime against another person or property while in the dwelling can be formed either before or after the unlawful entry"), *aff'd on other grounds*, 255 P.3d 1032 (Colo. 2011); *People v. Larkins*, 109 P.3d 1003, 1004 (Colo.App.2004); *see also People v. Wartena*, 2012 COA 12, 296 P.3d 136, 140 (clarifying an apparently contradictory passing reference to *Cooper* in *People v. Fuentes*, 258 P.3d 320, 323 (Colo.App.2011), and agreeing with the holding of *Oram* ).

¶ 76 Accordingly, Bondurant's first two tendered instructions, requiring a finding that his intent to commit a crime be formed before or at the moment but not after he trespassed, misstated the law. Thus, the trial court did not abuse its discretion in refusing to tender these instructions to the jury. *Smith*, 77 P.3d at 756 ("a trial court may refuse to give a defendant's theory of the case instruction that misstates the law").

## V. Extrinsic Influence of News Story and Judicial Staff Member

¶ 77 Bondurant argues that the trial court committed reversible error in improperly addressing separate allegations made by him at trial that the jury was, or may have been, improperly exposed to extraneous information (1) in a news clip concerning a criminal defendant previously acquitted on a finding of NGRI and (2) during a face-to-face encounter with a judicial staff member. We perceive no error in the trial court's handling of either allegation.

### A. Standard of Review

■■■ ¶ 78 The due process right of every criminal defendant to a trial by an impartial jury "is satisfied by 'a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.'" *People v. Dahl*, 160 P.3d 301, 304 (Colo.App.2007) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).

■■■ ¶ 79 However, a trial court has broad discretion in its sentinel role, including in responding to allegations of irregularity in the jury's proceedings. *People v. Mollaun*, 194 P.3d 411, 415–16 (Colo.App.2008). Therefore, we will conclude that a court abused its discretion in so doing only when it made a decision that was manifestly arbitrary, unreasonable, unfair, or based on an erroneous view of the law. *Id.*

■■■ ¶ 80 Furthermore, we review for plain error any alleged errors by the trial court in addressing undue prejudice in the absence of a contemporaneous objection. *See People v. Miller*, 113 P.3d 743, 745 (Colo. 2005) (applying plain error analysis to unpreserved constitutional errors); *Wilson v. People*, 743 P.2d 415, 420 (Colo.1987) (plain error occurs if, after reviewing the entire record, we determine "with fair assurance that the

error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction").

### B. News Story

■ ¶ 81 Colorado courts must utilize a three-part test to determine whether midtrial media reports unfairly prejudiced the jury: (1) determine whether the coverage had the potential for unfair prejudice; (2) poll the jury to determine if it learned of the publicity; and (3) interview individual jurors to determine their knowledge of the report and its effect on them. *Harper v. People*, 817 P.2d 77, 83 (Colo.1991).

■ ¶ 82 In implementing the first step of this test, a trial court should consider "whether the content of the media report is inherently prejudicial" as well as "whether the report contained information that would not be admissible at trial or that was not in fact adduced before the jury and how closely related the publicity is to the matters at issue in the trial." *Id.* at 84 (citation omitted). A court may also consider the use of jury instructions admonishing jurors to ignore any relevance such media may have to the trial. *Id.*

■ ¶ 83 Although "[d]oubt about the existence of prejudice should be resolved by proceeding to step two and polling the jurors as a group," *Harper* does not require trial courts to proceed to polling if they deem it unnecessary. *Id.* ("[u]ltimately, the trial judge, exercising informed discretion, must determine the prejudicial effect, if any, of the publicity"); *see also Mollaun*, 194 P.3d at 418 ("where the court is able to determine from the nature of the allegedly prejudicial extraneous information and the surrounding circumstances that the information is not inherently prejudicial, the court does not abuse its discretion in failing to question the jurors"); *see also People v. Gardenhire*, 903 P.2d 1165, 1170 (Colo.App.1995) (concluding trial court did not abuse its discretion in refusing to poll jurors).

■ ¶ 84 Here, on the second day of trial, Bondurant brought to the trial court's attention a news story, published online, likely in print, and possibly on television, regarding a man previously acquitted of attempted murder on a finding of NGRI who later attacked a victim. Stating his concern that jurors exposed to this story might be hesitant to find him not guilty for lack of mens rea for fear of future tragic events, he requested the trial court poll the jury to determine the extent of any prejudice. The trial court refused, stating, "I don't see a tie [between the news story and this case] and I don't see the appropriateness of any action based on that."

¶ 85 We conclude that, based on its finding that the news story was irrelevant to Bondurant's case, the trial court did not abuse its discretion in not polling the jury under the second step of *Harper. See, e.g., Gardenhire*, 903 P.2d at 1171 (no abuse of discretion where media report did not concern the defendant's case).

### C. Encounter with Judicial Staff Member

■ ¶ 86 Bondurant also contends that the trial court erred in not polling jurors after the jury's unplanned encounter with a judicial staff member. We disagree.

¶ 87 During recess from deliberations, the jury entered an elevator with this staff member, whom the bailiff notified of the jury's presence. The staff member immediately stated, "He did it, he did it, he did it." After the bailiff reproached the staff member, she responded, "Oh never mind, he didn't do it, he didn't do it, he didn't do it." The bailiff testified as to these events, and as to the jury later joking about a hung or tainted jury.

¶ 88 In response, Bondurant moved for a mistrial. In his request, he stated that no other remedy would be appropriate. The trial court denied Bondurant's motion, finding that the staff member was not involved in the case and noting that the jurors appeared to have taken the interaction lightheartedly. Nonetheless, it gave the jury a written curative instruction, advising it to disregard what it had heard in the elevator.

¶ 89 The facts here do not establish that the jury learned prejudicial information during the elevator exchange, nor that it took the encounter seriously. Moreover, absent any evidence to the contrary, we presume

that the trial court's curative instruction alleviated any ill effects of this event. *See People v. Mersman,* 148 P.3d 199, 204 (Colo.App. 2006) (curative instructions will normally remedy any harm caused by a prejudicial statement). Therefore, we discern no error. *Wilson,* 743 P.2d at 420.

## VI. Cumulative Effect of Any Errors

¶ 90 Last, Bondurant contends that the trial court's numerous errors at trial deprived him of a fair trial and therefore warrant reversal and a new trial. Having concluded that the trial court did not commit any errors at trial, we also deny this final contention.

¶ 91 The judgment is affirmed.

Judge DAILEY and Judge FOX concur.