Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
October 15, 2018

**2018 CO 82**

**No. 16SC552, <u>Zapata v. People</u>—Physician-Patient Privilege—Psychologist-Client Privilege—Competency Evaluations—Res Gestae.**

In this case, the trial court declined to give the defendant access to, or to review in camera, competency reports regarding another defendant in a factually related but separate case.  Over objection, the trial court also admitted uncharged misconduct evidence as res gestae.

The supreme court holds that competency reports are protected by the physician-patient or psychologist-client privilege and that the examinee did not waive the privilege as to the defendant when he put his competency in dispute in his own case.  The supreme court also holds that the defendant's confrontation right is not implicated and that the defendant did not make a sufficient showing that the competency reports contained exculpatory evidence to justify their release to him or review by the trial court pursuant to due process or Crim. P. 16.

The supreme court further holds that any error in admitting the uncharged misconduct evidence as res gestae was harmless given the strong evidence of the defendant's guilt.

Accordingly, the supreme court affirms the judgment of the court of appeals.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 82

**Supreme Court Case No. 16SC552**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA2155

### Petitioner:

Nicholas Javier Zapata,

v.

### Respondent:

The People of the State of Colorado.

### Judgment Affirmed
*en banc*
October 15, 2018

**Attorneys for Petitioner:**
Megan Ring, Public Defender
Joseph P. Hough, Deputy Public Defender
       *Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
Gabriel P. Olivares, Assistant Attorney General
       *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE HART** specially concurs, and **JUSTICE GABRIEL** joins in the special concurrence.
**JUSTICE SAMOUR** dissents, and **CHIEF JUSTICE COATS** joins in the dissent.

¶1 One afternoon several years ago, the petitioner, Nicholas Zapata, and Jose Murillo entered a Littleton convenience store. Murillo darted behind the checkout counter, where he used a knife to attack the clerk, the only other person in the store. Zapata watched the attack from the other side of the counter. Perhaps to everyone's surprise, the victim quickly managed to subdue Murillo with a hammer that happened to be located behind the counter. With that unexpected turn of events, Zapata fled.

¶2 The People charged Zapata with attempted first degree murder and other crimes. At trial, the People asserted that Zapata orchestrated the attack. They painted a picture of a jealous and controlling Zapata, seeking revenge on behalf of his ex-girlfriend, S.M. S.M. worked in the convenience store and had confided in Zapata several weeks earlier that her boss, the store owner and father of the victim, had sexually harassed her. The People argued that Zapata convinced Murillo to do his dirty work in seeking revenge, but at the store, they confused the son for his father. The jury convicted Zapata of attempted second degree murder and first degree assault.

¶3 Zapata seeks a new trial because the trial court declined to give him access to, or to review in camera, certain competency reports regarding Murillo (who suffered brain damage as a result of the hammer blows). Zapata alleges the reports might contain exculpatory information about the criminal offenses of which he now stands convicted. He also argues that the trial court committed reversible error when it admitted "res gestae" evidence of Zapata's earlier threatening behavior toward S.M.

¶4 A division of the court of appeals affirmed Zapata's convictions, concluding as follows: Murillo's competency reports were privileged and no waiver justified

2

disclosure in Zapata's case; Zapata failed to make a particularized showing that the reports contained exculpatory information; and any error in admitting the res gestae evidence was harmless. *People v. Zapata*, 2016 COA 75, ¶¶ 22–30, 39, __ P.3d __.

¶5     We hold that Murillo's competency reports are protected by the physician-patient or psychologist-client privilege and Murillo did not waive the privilege as to Zapata when he put his competency in dispute in his own case. We further conclude that Zapata did not make a sufficient showing that the competency reports contained exculpatory evidence to justify their release to him or review by the trial court. Finally, we conclude that any error in the admission of res gestae evidence was harmless given the strong evidence of Zapata's guilt.

¶6     Thus, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶7     Before the assault in question, Zapata and Murillo boarded a light rail train in downtown Denver. Video surveillance footage shows the two stepping off the train seconds apart at the downtown Littleton station and walking side-by-side away from the station. About that time, Zapata texted S.M.: "Don[']t be there." He sent S.M. the same warning twice more in the next thirty minutes. S.M. responded to each message with confusion, asking what and where Zapata was talking about.

¶8     A short time after getting off the train, Zapata and Murillo entered Littleton Neighborhood Food and Gas. The victim, the son of the store owner, was there alone, working as a clerk. Murillo headed straight behind the counter and attacked the victim with a steak knife. The victim fought back first by yanking Murillo's shirt over his

head, and then by grabbing a hammer from a nearby tool box and using it to repeatedly strike Murillo in the head.

¶9 Zapata stayed on the other side of the counter and watched. A videotape of the incident that was admitted into evidence reveals that some variation of the words, "Get him, get him, get him good" were muttered, although at trial, the parties disputed whether Zapata or Murillo said the words. As Murillo groaned, Zapata backed up, turned around, and walked out of the store. The victim eventually subdued his assailant, Murillo, by battering him into unconsciousness with the victim's improvised weapon.

¶10 The People charged Zapata and Murillo, separately, with attempted first degree murder and other crimes. The People's theory was that Zapata, upon learning that the store owner had sexually harassed S.M., sought revenge. According to the People's version of events, Zapata and Murillo mistook the victim for his father. Zapata countered that there was no shared plan; rather, "Murillo was a loose cannon," addicted to drugs.

¶11 In the proceedings against Murillo, Murillo's counsel questioned his competency to stand trial. The fight had left Murillo with brain damage. Murillo's competency was evaluated twice, once by court order and another time at his own request. The record does not reveal what type of mental health professional examined Murillo. Regardless, Murillo eventually withdrew his claim of incompetency and entered plea negotiations with the prosecution. Murillo agreed to plead guilty to the lesser charge of conspiracy to commit second degree murder; in exchange, he would testify against Zapata.

¶12 Zapata sought access to records of any statements regarding the attack made by Murillo during his competency evaluations. Zapata alleged there was potentially exculpatory material in the competency reports, contending that Murillo could have made inconsistent statements to the competency evaluators that would provide impeachment material. Zapata argued the reports must be provided to him pursuant to section 16-8.5-104, C.R.S. (2018) (addressing "[w]aiver of privilege" as to competency evaluations), and Crim. P. 16.

¶13 Initially, the trial court ruled that Zapata was entitled to the reports. Murillo's counsel, however, objected on the grounds that the reports were privileged. At a hearing on the matter, the prosecution acknowledged that it had examined at least one of the competency reports during plea negotiations in Murillo's case, noting that there were "maybe two lines about the actual incident in this competency evaluation, and there is nothing in the competency evaluation that is not in the proffer that we've already discovered anyway."

¶14 Ultimately, the trial court denied Zapata's request for access to the competency reports, reasoning that they are privileged and the statute outlining who may receive information regarding a defendant's competency evaluation—the judge, defense counsel, and prosecution in the defendant's case—doesn't include a codefendant in a separate case. Zapata's attorney then requested that the court review the material in camera. The court denied that request as well.

¶15 The People also sought to introduce evidence that Zapata knew about the alleged sexual harassment of S.M. and evidence from a week before the convenience store

incident when Zapata allegedly sent a series of harassing, threatening, and profanity-ridden texts to S.M. The People argued the evidence was res gestae because "[Zapata's] jealousy and desire to resume his relationship with [S.M.], coupled with [the sexual harassment], form a crucial part of the overall narrative of this case," and the evidence regarding how obsessive Zapata was about S.M. was relevant to "why he would choose to take such an extreme action against the store owner." Zapata protested, arguing that S.M. was expected to testify at trial about his connection to the store and that Zapata's actions weeks before the attack bore no relevance to the attack at the convenience store and were unduly prejudicial. The trial court admitted the evidence as res gestae, reasoning that the evidence was necessary to explain "why this particular store, this particular store clerk," and stating that otherwise, "we're starting in the middle of the story."

¶16 On the first day of trial, before jury selection, defense counsel objected to any testimony by S.M. regarding physical altercations between S.M. and Zapata that had occurred in the six months before the convenience store attack. The People argued that any such testimony would also be res gestae evidence. The trial court agreed, ruling to allow the testimony.

¶17 S.M. testified at trial that she had asked Zapata to help her fill out a complaint with the U.S. Equal Employment Opportunity Commission because of the store owner's alleged harassment. S.M. testified that she told Zapata that the store owner had made sexual overtures and touched her inappropriately. S.M. also testified that Zapata was controlling and wanted to know where she was at all times and that they would

6

physically fight when she talked to other men. She testified that about a week before the attack, Zapata sent her a series of fifty or so text messages threatening her and her family when he learned she was seeing someone else. The threatening and explicit text messages were admitted into evidence at trial.

¶18    Murillo testified at trial that he had known Zapata for six months, had no memory of the attack, and had never been to Littleton or seen the victim or the store owner before the attack.

¶19    The jury convicted Zapata of attempted second degree murder (a lesser-included offense) and first degree assault, acquitting him of conspiracy to commit murder in the first degree. The court sentenced Zapata to twenty-one years in prison for each count, to run concurrently.

¶20    Zapata appealed. In relevant part, he contended that there are two sources of reversible error by the trial court: (1) the failure to provide the competency reports to him, or at least conduct an in camera review of the reports, and (2) the admission of res gestae evidence from the months leading up to the attack showing that Zapata was controlling, obsessive, and physically abusive toward S.M.

¶21    A division of the court of appeals affirmed Zapata's conviction. The division held that Murillo's competency reports were protected under the psychologist-client privilege and the privileged material was discoverable only in Murillo's case, not Zapata's. *Zapata*, ¶¶ 22–29. The court of appeals also concluded that Zapata had not made a "particularized showing that the statements Mr. Murillo allegedly made during

the competency evaluations somehow exculpated [the] defendant, or were inconsistent with the information in Mr. Murillo's proffer." *Id.* at ¶ 30.

¶22 Without addressing whether it was error to admit the evidence of res gestae, the division also held that any error was harmless. *Id.* at ¶ 39. In reaching this conclusion the division reasoned that "the evidence supporting the prosecution's theory was compelling," and the evidence corroborating the defendant's theory was weak. *Id.* at ¶¶ 40–41.

¶23 Zapata petitioned this court for review of the same issues. We granted certiorari.[1]

## II. Standard of Review

¶24 The issues regarding the competency reports are issues of law, insomuch as they require us to interpret statutes governing privilege in the context of criminal discovery. We review issues of law de novo. *People v. Rediger*, 2018 CO 32, ¶ 18, 416 P.3d 893, 898 (statutory interpretation); *People v. Kailey*, 2014 CO 50, ¶ 12, 333 P.3d 89, 93 (interaction of psychologist-patient privilege with other statutes).

---

[1] We granted certiorari to review the following issues:
  1. Whether the court of appeals erred in not finding that the trial court should have either disclosed or reviewed, in camera, the co-defendant's statements about the crime.
  2. Whether the court of appeals erred in not finding that the admission of irrelevant and prejudicial evidence of the defendant's character and other bad acts was reversible.

¶25   We review evidentiary rulings, such as the admission of res gestae evidence, for abuse of discretion. *See People v. Stewart,* 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion "when its ruling is manifestly arbitrary, unreasonable, or unfair." *Id.*

### III. Analysis

¶26   We begin by considering whether Zapata was entitled to examine, or to have the court examine, the competency reports regarding Murillo. We first conclude that competency reports, completed by either a psychiatrist or licensed psychologist per the competency statute, are protected by the physician-patient or psychologist-client privilege. Next, we discuss whether Murillo waived that privilege. Based on the language of the competency statute, we conclude that any statutory waiver was limited and does not extend to Zapata's case. We then address Zapata's constitutional and Crim. P. 16 arguments. After determining that Zapata's confrontation right is not implicated, we examine whether due process or Crim. P. 16 required the disclosure or in camera review of the reports. We conclude that Zapata did not make a sufficient showing that Murillo's reports contained material evidence.

¶27   Finally, we consider whether the trial court committed reversible error by admitting evidence of Zapata's controlling and threatening behavior toward S.M. as res gestae evidence. We conclude, after observing that there was strong evidence of Zapata's guilt, that any error in admitting the res gestae evidence was harmless.

9

## A. Competency Reports

¶28    First, Zapata asserts that Murillo's competency reports should have been provided to him or reviewed in camera.

## 1. The Competency Reports Are Privileged

¶29    Zapata argues that Murillo's competency reports are not privileged. We disagree. First, we observe that Zapata likely forfeited this argument, abandoned it on appeal, or both. At the motions hearing, Zapata's counsel appeared to assume that the reports were privileged and argued only that the privilege was waived. Likewise, on appeal, Zapata focused his argument on waiver. Regardless, we conclude that competency reports are protected by the psychologist-client or physician-patient privilege.

¶30    In addressing these privileges, we must first consider whether a psychologist or physician was involved. Court-ordered and defendant-requested competency evaluations must be conducted by a "competency evaluator." § 16-8.5-101(5), C.R.S. (2018) (defining "[c]ourt-ordered competency evaluation"); § 16-8.5-106, C.R.S. (2018) (allowing a defendant "to be examined by a competency evaluator of his or her own choice"). And "competency evaluator" means a licensed psychologist (with certain qualifications) or a psychiatrist. § 16-8.5-101(2). The record does not include, under seal or otherwise, copies of the reports. Thus, the record does not reveal the identity or professional status of the competency evaluator(s) who conducted the evaluations at issue here. But there is no indication of any failure to comply with section 16-8.5-101(2). Therefore, we assume that either a psychologist or a psychiatrist conducted the

10

evaluations at issue here. We examine the requirements for privilege as to each type of professional.

¶31    Communications between a client and licensed psychologist implicate the psychologist-client privilege statute, section 13-90-107(1)(g), C.R.S. (2018). Under this statute, "[a] licensed psychologist . . . shall not be examined without the consent of the licensee's . . . client as to any communication made by the client to the licensee . . . or the licensee's . . . advice given in the course of professional employment." § 13-90-107(1)(g). Here, the only portion of the psychologist-client privilege that would be at issue is that which addresses communications made by the client to the licensed psychologist. We acknowledge that the psychologist offers no "advice" (in the clinical sense) to the defendant in this context.

¶32    Because psychiatrists are licensed physicians, their communications with patients implicate the physician-patient statute, section 13-90-107(1)(d). Under this statute, "[a] physician . . . shall not be examined without the consent of his or her patient as to any information acquired in attending the patient that was necessary to enable him or her to prescribe or act for the patient . . . ." § 13-90-107(1)(d).

¶33    Both privileges prohibit both testimonial disclosures and "pretrial discovery of information within the scope of the privilege." *Clark v. Dist. Court*, 668 P.2d 3, 8 (Colo. 1983). This includes "files or records derived or created in the course of the treatment." *People v. Sisneros*, 55 P.3d 797, 800 (Colo. 2002) (psychologist-patient privilege).

¶34    Because the competency evaluation statute required licensed psychologists or psychiatrists to conduct the competency evaluations at issue here, the reports are

11

privileged if (1) Murillo was a patient or client of the evaluator, (2) the evaluator "attended" to Murillo in conducting the evaluation, and (3) the information acquired in attending to Murillo was necessary to enable the evaluator to act for Murillo. We conclude that all three requirements are met. (We take it as a given that a licensed psychologist would be acting "in the course of professional employment" in evaluating a defendant's competency.)

¶35 First, we observe that the question of whether the evaluator "attended to" Murillo in conducting the evaluation is closely connected to the question of whether Murillo was the evaluator's patient or client. Merriam-Webster defines "attend," as relevant here, as "to look after" or "to visit professionally especially as a physician."[2] *Attend*, Merriam-Webster's Online Dictionary, https://merriam-webster.com/dictionary/attend [https://perma.cc/7L72-R75S]. Physicians certainly "visit" their patients "professionally." Thus, we begin by examining whether Murillo was a patient or client of the evaluator.

¶36 The privilege statute does not define "patient" or "client." Black's Law Dictionary simply defines "patient" as "[a] person under medical or psychiatric care." *Patient*, Black's Law Dictionary (10th ed. 2014). While criminal defendants undergoing competency evaluations typically are not patients or clients in a "fee-for-service" sense, competency evaluations are utilized for diagnostic and treatment purposes. The

---

[2] Black's Law Dictionary does not define "attend."

competency evaluator is, at least in part, performing a role typical of a physician or psychologist in a physician-patient or psychologist-client relationship. In a "[c]ourt-ordered competency evaluation," the examination of the defendant is "directed to developing information relevant to a determination of the defendant's competency to proceed at a particular stage of the criminal proceeding." § 16-8.5-101(5). A defendant is "[c]ompetent to proceed" if he:

> do[es] not have a mental disability or developmental disability that prevents [him] from having sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding in order to assist in the defense or prevents [him] from having a rational and factual understanding of the criminal proceedings.

§ 16-8.5-101(4). If the defendant is incompetent to proceed, the court has discretion to determine how to restore the defendant to competency. *See* § 16-8.5-111, C.R.S. (2018). Any course of action by the court, however, must contemplate using the competency evaluation as a starting point for treatment to restore competency. In sum, the competency evaluator examines the defendant to determine whether the defendant is incompetent and thus needs treatment to address a mental or developmental disability that prevents the defendant from consulting reasonably with his lawyer and understanding the proceedings. Because the competency evaluator is, in part, performing a role typical of a physician-patient or psychologist-client relationship, we conclude that Murillo was a client or patient of the evaluator and the evaluator "attended to" Murillo in conducting the evaluations.

¶37 Now we turn to whether the information acquired in attending Murillo was *necessary* to enable the evaluator *to act* for him. In general, "before ruling on [a] claim of

13

privilege . . . , the trial court [must] determine[] whether the particular information . . . sought . . . [is] in fact necessary for treatment." *People v. Reynolds*, 578 P.2d 647, 649 (Colo. 1978). An evaluator may question the defendant about the offense and its surrounding circumstances—and thus would "acquire that information" in the parlance of the privilege statute—"[t]o aid in forming an opinion as to the competency of the defendant." § 16-8.5-105(3).

¶38 And acquiring that information enables the evaluator to act for the defendant. Competency evaluations, even when court ordered, are conducted, at least in substantial part, for the defendant's benefit. The U.S. Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)). Thus, these evaluations benefit defendants by protecting their due process rights. Because forming an opinion as to the defendant's competence is done for the defendant's benefit, information utilized in forming such an opinion is necessary for the evaluator to act for the defendant.

¶39 Thus, we conclude that competency reports are privileged. While the plain language justifies this conclusion, we further note that the purpose of these privileges is to encourage forthrightness between clients and patients and their psychologists and psychiatrists. *See People v. Dist. Court*, 719 P.2d 722, 724 (Colo. 1986) (psychologist-client privilege); *Cmty. Hosp. Ass'n v. Dist. Court*, 570 P.2d 243, 244 (Colo. 1977) (physician-patient privilege). Given the weighty due process rights at stake, we surely

14

want to encourage such forthrightness between defendants and the professionals evaluating their competency.

¶40 Because competency reports are privileged, they may not be revealed absent Murillo's consent or waiver. Murillo has not consented. Thus, Murillo's competency reports are privileged unless the privilege has been waived. We next address whether the privilege was waived under section 16-8.5-104.[3]

### 2. The Competency Statute Waives Privilege Only as to the Parties in that Defendant's Case

¶41 Zapata argues that Murillo waived the physician-patient or psychologist-client privilege when he put his mental condition at issue by raising competency under section 16-8.5-104. We disagree. The statute waives a defendant's privilege in the competency evaluation only as to the parties and the court in *that defendant's* case. Thus, Murillo's competency reports remain privileged outside of Murillo's case. And

---

[3] We acknowledge that our conclusion that competency reports are privileged may have implications for the use of such information in other contexts, such as a competency hearing or trial. Under section 16-8.5-108, evidence acquired during a competency evaluation is admissible in certain circumstances during that defendant's competency hearing, trial, and sentencing. While one could argue this statute seeks to safeguard a defendant's Fifth Amendment rights, *see* § 16-8.5-104(6) ("Statements made by the defendant in the course of any evaluation shall be protected as provided in section 16-8.5-108."), *cf. Lewis v. Thulemeyer*, 538 P.2d 441, 442 (Colo. 1975) (concluding that the legislative scheme governing sanity evaluations "carefully avoided the constitutional proscriptions against self-incrimination"), the plain language addresses general admissibility of evidence acquired during a competency evaluation. A defendant may also waive his psychologist-client or physician-patient privilege through a course of conduct that impliedly concedes the necessity of revealing otherwise confidential information to third parties during the course of a presumptively public proceeding. *Cf. Gadeco, L.L.C. v. Grynberg*, 2018 CO 22, ¶ 2, 415 P.3d 323, 326 (reviewing ways in which a patient can impliedly waive his physician-patient privilege).

Zapata's case, despite its obvious factual overlap with Murillo's, was outside of Murillo's. Zapata and Murillo were prosecuted separately.

¶42 We begin our analysis with the statute, which enumerates the three parties as to whom the privilege is waived. Section 16-8.5-104(1) provides: "When a defendant raises the issue of competency to proceed, . . . any claim by the defendant to confidentiality or privilege is deemed waived, and *the district attorney, the defense attorney, and the court are granted access*, without written consent of the defendant or further order of the court" to information relating to the competency evaluation, including competency evaluation reports. § 16-8.5-104(1) (emphasis added). To the extent the statute could be construed to suggest that there is a general waiver and the enumerated parties are just those who receive the confidential material without a court order, we reject that reading. Four of the five remaining subsections contemplate disclosure only to the same three recipients—defense counsel, the prosecutor, and the court in the defendant's case—reinforcing that the waiver is limited to the parties and the court in that case.[4] *Cf. Roberts v. Bruce*, 2018 CO 58, ¶ 8, 420 P.3d 284, 286 ("[W]e

---

[4] § 16-8.5-104(2) ("Upon a request by *either party* . . . the evaluator . . . shall provide the information . . . ." (emphasis added)); § 16-8.5-104(3) ("An evaluator . . . is authorized to provide . . . procedural information *to the court, district attorney, or defense counsel* . . . ." (emphasis added)); § 16-8.5-104(4) ("Nothing in this section limits the court's ability to order that information . . . be provided *to the evaluator, or to either party to the case* . . . ." (emphasis added)); § 16-8.5-104(5) ("The court shall order *both the prosecutor and the defendant or the defendant's counsel* to exchange the names . . . of each physician or psychologist who has examined or treated the defendant for competency." (emphasis added)).

read the statute as a whole and seek to give consistent, harmonious, and sensible effect to all its parts."). Thus, section 16-8.5-104(1) creates a limited waiver of privilege.

¶43    While the statute does not create a general waiver, we consider whether Murillo's actions somehow did. Zapata argues that a defendant who raises competency implicitly waives privilege by placing his mental condition at issue. True, we have said that the test for waiver is "whether the [privilege-holder] has injected her physical or mental condition into the case as the basis of a claim or an affirmative defense." *Sisneros*, 55 P.3d at 801. Yet, the question isn't whether a defendant waives privilege by raising competency. Of course he does: The statute says so. The question is about the scope of the statutory waiver: Does it extend beyond the parties in the defendant's case? The General Assembly has expressly provided when, how, and to whom a defendant waives his physician-patient or psychologist-client privilege by raising competency. Zapata's theory that raising competency waives privilege entirely would subvert that legislative scheme.

¶44    In a similar vein, Zapata argues that exposure of the privileged information to a third party breaks confidentiality and therefore destroys privilege. Specifically, he claims that Murillo waived any privilege by sharing information about his competency evaluations with the prosecution and the court. We have said, at least in other contexts, that exposure to a third party can destroy privilege. *See Hartmann v. Nordin*, 147 P.3d 43, 52–53 (Colo. 2006) ("Information a person makes available to a third party outside of the physician-patient privilege is not protected by the physician-patient privilege."); *Wesp v. Everson*, 33 P.3d 191, 198 (Colo. 2001) ("[I]f a communication to

17

which the [attorney–client] privilege has previously attached is subsequently disclosed to a third party, then the protection afforded by the privilege is impliedly waived."). Of course, we have also noted that the scope of "implied waivers [has] always been limited by the circumstances of the case." *Alcon v. Spicer*, 113 P.3d 735, 739 (Colo. 2005). But where, as here, the General Assembly has specified that only a limited waiver occurs, that—not a general common law principle—controls. *See* Colo. Const. art. V, § 1(1) ("The legislative power of the state shall be vested in the general assembly . . . .").[5]

¶45 Because we have determined that section 16-8.5-104(1) waives Murillo's physician-patient or psychologist-client privilege in the competency reports only as to the parties in Murillo's case, we conclude that the privilege has not been impliedly waived by exposure to third parties here. Because Zapata is a defendant in an entirely separate criminal case, he is not entitled to the reports.

¶46 Finally, we address Zapata's constitutional and Crim. P. 16 arguments. Zapata argues that his confrontation right, due process, and Crim. P. 16 demand that he receive, or at least the trial court review in camera, Murillo's competency reports. We turn to these claims now.

---

[5] We do not foreclose the possibility that there may be an implied waiver of privilege related to a competency report on other facts.

### 3. The Trial Court's Nondisclosure Does Not Violate the Confrontation Clause, Due Process Clause, or Crim. P. 16

¶47 First, we address Zapata's Confrontation Clause argument. We then consider whether the Due Process Clause or Crim. P. 16 compels the trial court to review the reports or provide them to Zapata.

¶48 A defendant has a right to confront witnesses against him. U.S Const. amend. VI; Colo. Const. art. II, § 19. However, a defendant's confrontation right "is a trial right; it is not a 'constitutionally compelled rule of pretrial discovery.'" *People in the Interest of E.G.*, 2016 CO 19, ¶ 28, 368 P.3d 946, 953 (quoting *People v. Spykstra*, 234 P.3d 662, 670 (Colo. 2010)); *accord Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987) (plurality opinion). Here, Zapata argues the Confrontation Clause required the court to conduct an in camera review of pretrial discovery. In essence, he seeks to bootstrap his trial right to confront his accusers into a pretrial discovery right. Because his trial right to confront witnesses is not at issue, we reject Zapata's confrontation argument.

¶49 Zapata's due process argument warrants more discussion. Under *Brady v. Maryland*, the Due Process Clause requires the government to disclose information that is favorable to the accused and "material either to guilt or to punishment." 373 U.S. 83, 87 (1963). Consequently, impeachment material must be disclosed under *Brady*. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (holding that the government must disclose evidence affecting a witness's credibility, especially when that witness's testimony is crucial to

the government's case).  Because Crim. P. 16 "codifies *Brady*'s constitutional disclosure requirement," we evaluate this argument "through the lens of *Brady*."  *People v. Bueno*, 2018 CO 4, ¶ 28, 409 P.3d 320, 326.[6]

¶50    Here, although Murillo and Zapata were defendants in entirely separate cases, the prosecutor in Zapata's case had access to the competency reports in Murillo's case.  Zapata argues that those reports might contain exculpatory information, such as inconsistent statements by Murillo about the assault.  Thus, he contends the trial court abused its discretion in declining to either provide him with the privileged reports or review them in camera.

¶51    The U.S. Supreme Court considered a similar situation in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987).  Ritchie wanted the trial court to review a file from the state child-protection agency about his alleged sexual abuse of his daughter, arguing it might contain exculpatory evidence, including the names of potentially favorable witnesses. *Id.* at 43–44.  A Pennsylvania statute made records from the agency privileged, but the privilege contained some exceptions, including that the agency must disclose the records to "[a] court of competent jurisdiction pursuant to a court order."  *Id.*  Although

---

[6] To the extent that Zapata's Crim. P. 16 argument is not a constitutional one, we refer back to our observation that the physician-patient and psychologist-client privileges prohibit both testimonial disclosures and the pretrial discovery of privileged information.  *See Sisneros*, 55 P.3d at 800 ("Once the privilege has attached, the Defendant may not compel discovery unless it is waived."); *Clark v. Dist. Court*, 668 P.2d at 8.

20

the prosecutor did not have the records, *id.* at 44 n.4, *Brady* applied because the agency was part of the state government, *see id.* at 57.

¶52     The *Ritchie* Court held that the Due Process Clause required an in camera review of the material:

> Given that the Pennsylvania Legislature contemplated *some* use of [the agency's] records in judicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions.  In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is "material" to the defense of the accused.

*Id.* at 58.

¶53     The defendant, on the other hand, was not entitled to receive the file for his own review.  The *Ritchie* Court held that a defendant does not get to review a privileged file himself for the benefit of the "advocate's eye"; he gets at most the court's in camera review, if there is a legal basis for such review.  *Id.* at 59–61.

¶54     Importantly, *Ritchie* does not hold that trial courts must always review privileged reports in camera pursuant to *Brady*.  The Court expressly noted that a defendant "may not require the trial court to search through the [privileged] file without first establishing a basis for his claim that it contains material evidence."  *Id.* at 58 n.15 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.")).  We have expanded on this point: For a court to review statutorily privileged material, the initial showing must be more than a "vague assertion that the victim may have made statements to her therapist that might possibly differ from the

21

victim's anticipated trial testimony." *People v. Dist. Court*, 719 P.2d at 726; *accord People v. Wittrein*, 221 P.3d 1076, 1084 n.7 (Colo. 2009); *see also Dill v. People*, 927 P.2d 1315, 1325 (Colo. 1996).

¶55 Here, Zapata made only a vague assertion that the statements might include impeachment material. Zapata contends that Murillo "might have possibly" said something in the context of a privileged relationship at odds with the witness's anticipated trial testimony based on other discovery. At a motions hearing, the prosecution provided Zapata a proffer of Murillo's expected testimony, which was that Murillo did not remember the day of the event. The prosecutor represented, "as an officer of the court," that there were "maybe two lines about the actual incident in this competency evaluation, and there is nothing in the competency evaluation that is not in the proffer." Zapata discussed how Murillo had been shown the video of the attack at some point, and speculated that the reports might reveal that watching the videos caused Zapata to add or subtract details about his story. However, Zapata does not indicate what Murillo might have added or subtracted to his story. His speculative contention does not rise to the level of more than the kind of "vague assertion" we have deemed inadequate to mandate disclosure.

¶56 Therefore, we conclude that Zapata has not made a sufficient showing that the privileged reports contain material evidence to justify disclosure or in camera review.

## B. Res Gestae Evidence

¶57 Defense counsel argues the trial court abused its discretion when it admitted "res gestae" evidence regarding threatening, harassing, and physically abusive behavior by

Zapata toward S.M. (and people close to S.M.).  We conclude that we need not address Zapata's contentions because any error in admitting the evidence was harmless.

### 1.  The Res Gestae Doctrine

¶58     We have defined res gestae evidence as uncharged misconduct evidence that is intertwined with the charged conduct:

> Res gestae evidence includes evidence of another offense, which is related to the charge on trial, that helps to "provide the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred." Generally, res gestae evidence is linked in time and circumstances to the charged crime, it forms an integral and natural part of the crime, or it is necessary to complete the story of the crime for the jury. When evidence is admitted as res gestae evidence, it is not subject to the general rule excluding evidence of prior criminality.

*People v. Skufca*, 176 P.3d 83, 86 (Colo. 2008) (quoting *People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994)) (internal citations omitted).

¶59     Zapata argues that the evidence regarding his behavior toward S.M. should not have been admitted as res gestae evidence because: (1) the evidence describes events too unconnected to be considered res gestae; (2) it is improper character evidence pursuant to CRE 404(b); (3) it is irrelevant pursuant to CRE 401; and (4) it is unduly prejudicial pursuant to CRE 403.

¶60     However, we need not address these arguments.  Even if the trial court erred in admitting uncharged misconduct evidence as res gestae, we conclude any such error was harmless.

23

## 2. Any Error in Admitting the Res Gestae Evidence Was Harmless

¶61 We review nonconstitutional trial errors that were preserved by objection for harmlessness. *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119. Under this standard, reversal is warranted if the error affects the substantial rights of the parties, meaning "the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)); *accord Johnson v. Schonlaw*, 2018 CO 73, ¶ 11, __ P.3d __.

¶62 If we can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error is harmless. *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989). While "[w]e have never reduced the question of a trial error's prejudicial impact to a specific set of factors[,] . . . the strength of the properly admitted evidence supporting the guilty verdict is clearly an 'important consideration' in the harmless error analysis." *Pernell v. People*, 2018 CO 13, ¶ 25, 411 P.3d 669, 673 (quoting *Crider v. People*, 186 P.3d 39, 43 (Colo. 2008)); *accord Johnson*, ¶ 12. Another important consideration "is the specific nature of the error committed and the nature of the prejudice or risk of prejudice associated with it." *Crider*, 186 P.3d at 43; *accord Johnson*, ¶ 12. Thus, we turn to evaluating the strength of the admissible evidence on which Zapata was convicted, as well as the nature of the risk of prejudice associated with the potentially impermissible admission of evidence.

¶63    Zapata was convicted on a complicity theory.  Under this theory, a defendant is legally accountable as a principal for the criminal act of another if "he aids, abets, advises, or encourages the other person in planning or committing that offense" with:

> (1) the intent to aid, abet, advise, or encourage the other person in his criminal act or conduct, and (2) an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question.

*People v. Childress*, 2015 CO 65, ¶ 34, 363 P.3d 155, 165; *see* § 18-1-603, C.R.S. (2018). "With regard to causing a particular result that is an element of the offense in question, . . . complicitor liability as defined by statute in Colorado mandates that the complicitor act with an awareness the principal is or would be acting with that required mental state." *Childress*, ¶ 29, 363 P.3d at 164.  "[C]ircumstances attending the act or conduct," refer to "those elements of the offense describing the prohibited act itself and the circumstances surrounding its commission, including a required mental state, if any." *Id.*

¶64    The jury convicted Zapata of attempted second degree murder and first degree assault.  The requisite culpable mental state for second degree murder is knowingly. § 18-3-103(1), C.R.S (2018).  Attempt liability also requires that the defendant, acting with the kind of culpability otherwise required for commission of an offense, engage in conduct constituting a substantial step toward the commission of the offense.  A substantial step is any conduct that is strongly corroborative of the firmness of the actor's purpose to complete the offense. § 18-2-101, C.R.S. (2018).  First degree assault,

as charged here, requires that a defendant act with the specific intent to cause serious bodily injury by means of a deadly weapon. § 18-3-202(1)(a), C.R.S. (2018).

¶65 Thus, in order for Zapata to be guilty of the crimes for which he was convicted, there needed to be evidence beyond a reasonable doubt that he intended to facilitate Murillo in his criminal act or conduct, and that Zapata did so with an awareness of the actual circumstances, namely an effort to kill the victim, and the specific intent to cause him, at the very least, serious bodily injury by means of a deadly weapon.

¶66 The record reveals strong evidence of Zapata's complicity in the offenses of which the jury found him guilty. According to Zapata, he was merely present when Murillo, a "loose cannon," committed the attack. However, significant evidence supports the notion that Zapata enlisted the aid of Murillo: the photos of Zapata and Murillo entering and leaving the light rail together; Zapata's numerous texts warning S.M., "Don[']t be there"; Zapata's calm demeanor in the video while he watched the attack; even Murillo's testimony that he had never been to the store before—or to Littleton for that matter—and that he had never seen the victim or store owner before the attack. And there's no evidence suggesting another motive for Murillo to go to the Littleton store or to commit the attack. In contrast, even without the res gestae evidence, the testimony by S.M. that she told Zapata about the unwanted sexual attention from the store owner provided a very strong motive for Zapata to convince Murillo to attack the store owner. That Murillo did so with a steak knife right in front of Zapata without any protest from Zapata (coupled with the "get him good"

26

incitement that would more logically come from the viewer rather than the assailant) provides even more evidence of the requisite culpable mental states.

¶67 Turning to the nature of the res gestae evidence and its risk for prejudice, we acknowledge that some of the admitted, uncharged misconduct evidence was inflammatory. However, given the strength of the other evidence against Zapata and the implausibility of the defendant's "innocent bystander" theory of the case, we do not believe the uncharged misconduct evidence was so prejudicial as to substantially influence the verdict or impair the fairness of the trial. Because there was strong evidence of Zapata's guilt and an implausible counterargument to that evidence, the res gestae evidence was not so prejudicial as to substantially influence the verdict or impair the fairness of the trial. Thus, we conclude any error as to the admission of res gestae evidence was harmless. *See Pernell*, ¶ 25, 411 P.3d at 673; *Crider*, 186 P.3d at 43.

## IV. Conclusion

¶68 We hold that Murillo's competency reports are protected by the physician-patient or psychologist-client privilege and Murillo did not waive the privilege as to Zapata when he put his competency in dispute in his own case. We further conclude that Zapata did not make a sufficient showing that the competency reports contained exculpatory evidence to justify their release to him or review by the trial court. Finally, we conclude that any error in the admission of res gestae evidence was harmless given the strong evidence of Zapata's guilt.

¶69 Thus, we affirm the judgment of the court of appeals.

27

**JUSTICE HART** specially concurs, and **JUSTICE GABRIEL** joins in the special concurrence.

**JUSTICE SAMOUR** dissents, and **CHIEF JUSTICE COATS** joins in the dissent.

JUSTICE HART, specially concurring.

¶70    I join the majority opinion in full.  I write separately, however, to express my concern over the trial court's decision to admit highly prejudicial and unrelated evidence under the guise of "res gestae."  While I agree with the majority that, in this particular case, the error in admitting the res gestae evidence was harmless, the issue is a close one and I believe that it must be acknowledged as error.  Further, I have serious reservations about the continued appropriateness of the res gestae doctrine and believe that, in an appropriate case, this court should consider whether to join other jurisdictions that have abandoned the doctrine.  *See* C.A.R. 35(e)(3) (recognizing, albeit in a different context, the propriety of using a special concurrence to "direct[] attention to the shortcomings of existing common law or inadequacies in statutes").

I.

¶71    The res gestae doctrine has its roots in common law, where it was initially employed as an exception to the general prohibition on the admission of hearsay and permitted the admission of statements made at the time an event occurred.  The idea was that witnesses might need to include these statements to complete the story of what had occurred, and that the statements were reliable because they were spontaneous. *See* H. Patrick Furman & Ann England, *The Expanding Use of the Res Gestae Doctrine*, 38 Colo. Law. 35, 35 (2009).  Over the years, the doctrine itself has expanded to permit the introduction of evidence well beyond contemporaneous statements.  As the majority notes, our definition of res gestae now encompasses any "uncharged misconduct evidence that is intertwined with the charged conduct."  Maj. op. ¶ 57.

1

¶72     In this case, some of the evidence was appropriately admitted. In particular, text messages between Zapata and S.M. concerning her alleged sexual assault by the convenience store owner and Zapata's request that she not be at the store on the day of the crime were important to "complete the story of the crime for the jury." In addition to this evidence that explained Zapata's motive and suggested his intent to commit the crime, however, the trial court permitted the prosecution to introduce Zapata's profanity-filled texts about S.M.'s relationship with a new boyfriend who had no connection with the crime and texts to and about S.M.'s family that were similarly crude. The prosecution was also permitted to introduce evidence about Zapata's alleged physical abuse of S.M. during the last six months of their relationship and his controlling behavior toward her during that same time frame.

¶73     Because I cannot discern a verifiable and significant connection between the defendant's alleged prior bad acts towards S.M., her new boyfriend, and her family and the subsequent assault of the store clerk, I cannot conclude that this evidence was properly admitted. In other words, I respectfully disagree with the trial court that the jury needed this evidence because it was all part of one big story. To the contrary, this evidence should not have been allowed to go before the jury; it served the prohibited purpose of demonstrating the defendant's purported threatening and violent bad character.

¶74     That this evidence was improperly admitted is also shown by the way the prosecutor used it in closing argument: "What else do you want to know about [the defendant]? Prior to the incident you know how he reacts to and what he thinks about

people who are messing with [S.M.] And what he would like to do to them." In essence, the jury was encouraged to use the defendant's threatening and violent bad character from the past to determine what happened in the present case, with an unrelated victim.

¶75 Our Rules of Evidence provide a specific mechanism in C.R.E. 404(b) for considering whether this kind of otherwise-inadmissible character evidence may be introduced. The evidence admitted in this case as res gestae should have been assessed for whether it met the substantive and procedural requirements of 404(b). Had such an assessment been made, I doubt that the trial court would have permitted the prosecution to use the evidence as it did. Unfortunately, the label "res gestae" short-circuited the evaluation called for in Rule 404(b), as it too often does.

## II.

¶76 This case would not have been an appropriate vehicle to consider whether Colorado should continue to recognize the res gestae doctrine because the error in admitting the unrelated evidence was harmless. There is, however, good reason for this court, in an appropriate case, to consider whether the doctrine has been rendered obsolete by modern rules of evidence. It is a vague and nearly standardless concept that is applied too expansively to admit otherwise inadmissible evidence. *See, e.g.*, Edward J. Imwinkelried, *The Second Coming of Res Gestae: A Procedural Approach to Untangling the 'Inextricably Intertwined' Theory for Admitting Evidence of an Accused's Uncharged Misconduct*, 59 Cath. U. L. Rev. 719, 729–30 (2010) (cataloging some of the wide-ranging criticism of res gestae and noting that "[t]he looseness of the doctrine

3

allows the courts to engage in 'result-oriented' decision-making") (citations omitted). Moreover, the most appropriate contexts for its application are likely already covered by the Colorado Rules of Evidence.

¶77    The continued utility of the doctrine has been questioned by a number of prominent experts in the law of evidence. *See* 2 George E. Dix et al., *McCormick on Evidence* § 268 (Robert P. Mosteller ed., 7th ed. Supp. 2016) ("[Res gestae's] vagueness and imprecision are apparent."); 4 Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 24:6 (7th ed. 2017) ("[U]se of the phrase 'res gestae' to delineate a hearsay exception is rightly regarded with disfavor."). One prominent treatise has ventured even further: "The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle." 6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1767 (James H. Chadbourne rev., 1976).

¶78    The Federal Rules of Evidence avoid using the term. *See* Fed. R. Crim. P. 404(b). And numerous jurisdictions, both state and federal, have rejected the use of the res gestae doctrine. *See Kenney v. Floyd*, 700 F.3d 604, 609 (1st Cir. 2012) ("Categories of evidence that were once excepted as 'res gestae' are now incorporated in either the definition of hearsay itself, Fed. R. Evid. 801, or the defined exceptions to the hearsay rule, Fed. R. Evid. 803–804."); *Miller v. Keating*, 754 F.2d 507, 509 (3d Cir. 1985) ("The old catchall, '*res gestae*,' is no longer part of the law of evidence."); *State v. Fetelee*, 175 P.3d 709, 735 (Haw. 2008) ("[T]he [Hawai'i Rules of Evidence] supersede[] the

4

common law *res gestae* doctrine."); *State v. Rose*, 19 A.3d 985, 988 (N.J. 2011) ("[T]he doctrine of res gestae no longer has vitality in light of the formal *Rules of Evidence*.").

¶79 Of course, there are other jurisdictions that continue to refer to the doctrine. *See United States v. Brown*, 888 F.3d 829, 836 (6th Cir. 2018) ("This Court recognizes an exception to Rule 404(b) for *res gestae* evidence where the evidence 'consis[t][s] of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense.'") (quoting *United States v. Olds*, 309 Fed. Appx. 967, 974 (6th Cir. 2009)). Because we have received no briefing on the question here, and because the error in this case was harmless, this is not the moment to consider which of these approaches Colorado should take. But, particularly in light of the expansive use of the doctrine in the trial courts, we might do well to take the matter up in a future case.

I am authorized to state that JUSTICE GABRIEL joins in this concurrence.

JUSTICE SAMOUR, dissenting.

## I.  Introduction

¶80    I respectfully dissent because I disagree with the majority's holding that Murillo's competency evaluation report is protected by the physician-patient or psychologist-client privilege and is inaccessible to Zapata.[1]  In my view, Zapata was entitled to Murillo's competency evaluation report, and the trial court's failure to afford him access to it was erroneous.  Further, although I agree with the majority's conclusion regarding the trial court's admission of res gestae evidence, I feel compelled to briefly comment on the concurring opinion.

## II.  Analysis

### A.  Privileges and Waiver

¶81    The majority concludes that, depending on the qualifications and training of the evaluator, either the physician-patient privilege or the psychologist-client privilege automatically attaches during the performance of any court-ordered competency

---

[1] The majority, the court of appeals, and the parties refer to competency evaluation reports (plural).  By and large, I refer to a single report because only one appears to have been filed with the trial court.  After completion of the court-ordered competency evaluation, which concluded that Murillo was competent, Murillo requested leave to have an evaluator of his own choosing conduct a second competency evaluation.  *See* § 16-8.5-106(1), C.R.S. (2018).  The trial court granted the request and a second evaluation was completed.  However, it appears that the report related to that second evaluation was never filed with the clerk of the court, although a copy of it was provided to the prosecution.  Murillo subsequently withdrew his claim of incompetency and accepted the prosecution's plea bargain offer.

evaluation in a criminal case. Moreover, according to the majority, the waiver created by subsection 16-8.5-104(1), C.R.S. (2018), is limited to the parties and the judge in the case in which the competency evaluation is completed. Therefore, the majority determines that Zapata had no right to access the report of the competency evaluation performed on Murillo in Murillo's case.[2]

¶82 I address the physician-patient and psychologist-client privileges first and then proceed to discuss the statutory waiver. Because I conclude that Murillo's competency evaluation report is not protected by either privilege, I would not reach the waiver issue.[3] I do so here because I disagree with the majority's interpretation of subsection 16-8.5-104(1).

### 1. Physician-Patient and Psychologist-Client Privileges

¶83 Court-ordered competency evaluations must be conducted by (1) a licensed physician who is a psychiatrist and who is trained in forensic competency assessments

---

[2] At one point, the prosecution admitted to the trial court that there were "maybe two lines about the actual incident" in Murillo's second competency evaluation report, but claimed that there was nothing in the report that was not included in a subsequent "proffer" Murillo provided the prosecution as part of his plea agreement. This statement, though, contradicted an earlier representation by the prosecution that "essentially what [Murillo] says" in his first evaluation "is he doesn't remember anything about the incident." Murillo testified during Zapata's trial that, although he did not remember the incident, he had known Zapata for six months before the attack, the convenience store's surveillance video showed him and Zapata while the attack took place, he and Zapata were not there to rob the store, and Zapata left him at the store to die.

[3] I limit my analysis to court-ordered competency evaluations; as such, I do not address evaluations performed pursuant to section 16-8.5-106, which are requested and paid for by the defendant and completed by an evaluator chosen by the defendant.

or a licensed psychologist who is trained in forensic competency assessments, (2) a psychiatrist who is in forensic training and practices under the supervision of a psychiatrist with expertise in forensic psychiatry, or (3) a psychologist who is in forensic training and practices under the supervision of a licensed psychologist with expertise in forensic psychology. § 16-8.5-101(2), C.R.S. (2018).[4] The question, then, is whether the report completed following Murillo's competency evaluation is protected by the physician-patient privilege or the psychologist-client privilege.[5] Because the answer necessarily depends on the scope of each privilege, I examine the statutory definition of each privilege first.

¶84 In Colorado, the physician-patient and psychologist-client privileges are governed by subsection 13-90-107(1), C.R.S. (2018). That statute prohibits a physician from being "examined without the consent of his or her patient as to any information acquired in attending the patient that was necessary to enable him or her to prescribe or act for the patient." § 13-90-107(1)(d). It also provides that a psychologist "shall not be examined without the consent of the . . . client as to any communication made by the

---

[4] As the majority indicates, there is no basis to believe that the competency evaluation performed on Murillo failed to comply with subsection 16-8.5-101(2). Consequently, Murillo's competency evaluation was conducted by a physician (including possibly a psychiatrist) or a psychologist.

[5] The majority correctly states that the record does not include, under seal or otherwise, a copy of the competency evaluation report completed. Zapata attempted to make the evaluation part of the record so that it would be available for review purposes. I believe it was improper for the trial court to refuse to allow him to do so.

client to the [psychologist]" or as to any "advice given" by the psychologist to the client "in the course of professional employment." § 13-90-107(1)(g).

¶85     The majority concludes that Murillo's competency evaluation report is protected by the physician-patient privilege and the psychologist-client privilege. Maj. op. ¶¶ 31–40. As to the former, the majority finds that Murillo was his evaluator's "patient" and that the evaluator acquired information in "attending" Murillo that was "necessary to enable" him "to act" for Murillo. *Id*. at ¶¶ 34–39. As to the latter, the majority finds that Murillo was his evaluator's "client" and that Murillo's communications to his evaluator were "in the course of professional employment."[6] *Id*. at ¶ 34.

¶86     Respectfully, the majority futilely attempts to pound the square peg of competency evaluation reports into the round hole of the physician-patient and psychologist-client privileges. I do not believe this ruling is tenable for multiple reasons. First, subsection 16-8.5-105(2), C.R.S. (2018), which addresses the protection of "[s]tatements made by the defendant in the course of the [competency] evaluation," does not contemplate protecting competency evaluation reports under the umbrella of the physician-patient and psychologist-client privileges. Second, the plain language in subsections 13-90-107(1)(d) and (1)(g) reflects that the physician-patient and psychologist-client privileges do not apply to competency evaluation reports. Third,

---

[6] The majority concedes that a psychologist "offers no 'advice' (in the clinical sense) to the defendant in [the] context" of a competency evaluation. Maj. op. ¶ 31.

the majority misunderstands subsections 13-90-107(1)(d) and (1)(g) and overlooks our decision in *Martinez v. Lewis*, 969 P.2d 213 (Colo. 1998). And finally, covering competency evaluations with the protective cloak of the physician-patient and psychologist-client privileges does not further the policies behind those privileges.

¶87 Subsection 16-8.5-105(2) fails to mention the physician-patient privilege, the psychologist-client privilege, or section 13-90-107. Had the legislature intended to afford a competency evaluation report the protection of the physician-patient privilege or the psychologist-client privilege (or any other privilege in section 13-90-107), it presumably would have done so in subsection 16-8.5-105(2).

¶88 The only protection subsection 16-8.5-105(2) affords statements made by the defendant during a competency evaluation is as set forth in section 16-8.5-108, C.R.S. (2018), which is titled "Evidence." § 16-8.5-105(2). Neither we nor divisions of the court of appeals have previously had occasion to interpret section 16-8.5-108. But its counterpart in the insanity arena, section 16-8-107, C.R.S. (2018), which is also titled "Evidence" and is nearly identical, has been repeatedly construed by divisions of the court of appeals as protecting only the defendant's privilege against self-incrimination under the Fifth Amendment to the United States Constitution. *See People v. Herrera*, 87 P.3d 240, 247 (Colo. App. 2003) ("The insanity statute protects [the privilege against self-incrimination] by limiting evidence obtained during [a sanity] examination to a defendant's mental condition" under "§ 16-8-107(1)(a), (1.5)(a)."); *id.* at 250 (subsections "16-8-107(1)(a) and (1.5)(a)," along with other statutory provisions, "protect a defendant's privilege against self-incrimination by limiting the use of evidence" to

5

certain purposes); *see also People v. Bondurant*, 2012 COA 50, ¶ 45, 296 P.3d 200, 210 (the General Assembly "replaced the express protection against self-incrimination with the provision that statements made by the defendant in the course of [a sanity] examination shall be protected as provided in section 16-8-107") (quotation and original alteration omitted).

¶89 The division of the court of appeals in this case incorrectly read section 16-8.5-108 as relevant to the psychologist-patient privilege. *See People v. Zapata*, 2016 COA 75M, ¶¶ 26–31, __P.3d__. The majority makes the same mistake in an attempt to harmonize its holding—that competency evaluation reports are confidential and privileged pursuant to subsections 13-90-107(1)(d) and (1)(g)—with the inescapable reality that the information in such reports is regularly used in open court during competency hearings, restoration hearings, jury trials, and sentencing hearings. Maj. op. ¶ 40 n.3.

¶90 Moreover, the plain language in subsections 13-90-107(1)(d) and (1)(g) does not include competency evaluation reports. First, as it relates to the physician-patient privilege, Murillo was not a "patient" of the evaluator. § 13-90-107(1)(d). Nor does the report contain information that was acquired while "attending" Murillo or that was "necessary to enable" the evaluator "to prescribe or act for" Murillo. *Id*. Rather, as part of Murillo's criminal case, and without first obtaining Murillo's agreement or consent, the court *ordered* the department of human services to have one of its evaluators (1) conduct a competency evaluation of Murillo, (2) prepare a written report of the evaluation, and (3) deliver the report to the clerk of the court so that a copy of it could then be forwarded to the prosecutor and defense counsel. Because the evaluator was

not Murillo's treating physician and did not obtain any information while attending to him, much less information that was necessary to allow him to prescribe or act for Murillo, the competency evaluation report does not fall within the scope of the physician-patient privilege.

¶91 The psychologist-client privilege is equally inapplicable. Murillo was not a "client" of the evaluator. § 13-90-107(1)(g). Nor did Murillo make any communication to the evaluator "in the course of [Murillo's] professional employment" of the evaluator. *Id.*. The evaluator was not professionally employed by Murillo, and Murillo and the evaluator did not have a professional employment relationship. Rather, the evaluator evaluated Murillo pursuant to an order issued by the court.

¶92 The majority misconstrues subsections 13-90-107(1)(d) and (1)(g). It insists that competency evaluations must be protected by the privileges because they "are utilized for diagnostic and treatment purposes." Maj. op. ¶ 36. Although the premise of this contention is technically correct, it is out of context. The purpose of a court-ordered competency evaluation in a criminal case is not to provide *health care* to the defendant by diagnosing or treating illnesses or conditions from which he may suffer. To the extent that there is a diagnosis in a competency evaluation, it is for the sole purpose of complying with the court's order to form and document certain opinions related to the defendant's competency. *See* § 16-8.5-105(5) (requiring the evaluator to provide "[a]n opinion as to whether the defendant suffers from a mental disability or developmental disability," a "diagnosis and prognosis" of any such "mental disability or developmental disability," and "[a]n opinion as to whether the defendant is competent

7

to proceed"). Likewise, to the extent that any treatment takes place during an evaluation, it is for the sole purpose of complying with the court's order to attempt to restore an incompetent defendant to competence. *See* § 16-8.5-111(2), C.R.S. (2018) (discussing the court's options when restoration is appropriate). In neither case does the evaluator act as the defendant's physician, psychologist, or health care provider; in neither case is the defendant a patient or a client of the evaluator; and in neither case does the defendant receive diagnostic care, treatment, or any other type of health care at his request (or even with his agreement or consent) from a physician, psychologist, or health care provider.

¶93 The majority next avers that evaluators "attend" to defendants during competency evaluations, as required by the physician-patient privilege. Maj. op. ¶¶ 34–36. But this ignores the nature of competency evaluations, which is not at all consistent with a physician "attend[ing]" to his patient. As relevant here, the word "attend" is defined as "to look after," "to go or stay with as a . . . nurse," and "to visit professionally especially as a physician." *Attend*, Merriam-Webster's Online Dictionary, https:// merriam-webster.com /dictionary/attend [https://perma.cc/7L72-R75S]. An evaluator ordered by the court in a criminal case to perform a competency examination does not "look after" the defendant, "go or stay with" the defendant as a nurse, or "visit" the defendant "professionally" as a physician would do with his patient. Rather, he evaluates the defendant for competency because he is ordered to do so by the judge presiding over the defendant's criminal case.

¶94    The analysis by the majority then turns conclusory.  The majority admittedly "take[s] it as a given" that evaluators act "in the course of professional employment," as required by the psychologist-client privilege.  Maj. op. ¶ 34.  In my view, that proposition is not "a given."  While evaluators no doubt act "in the course of professional employment" with the department of human services as they perform court-ordered competency evaluations, that is not what subsection (1)(g) requires.  Subsection (1)(g) provides that the psychologist-patient privilege protects "any communication made by the client to the [psychologist] . . . in the course of professional employment."  § 13-90-107(1)(g).  This cannot possibly mean what the majority apparently thinks it means—that any communication by a client to a psychologist, during a time when the psychologist is professionally employed somewhere by someone, is protected by the psychologist-patient privilege.  Instead, subsection (1)(g) must be read as referring to a communication by a client to a psychologist *during the course of professional employment between the client and the psychologist*.  Because an evaluator performing a court-ordered competency evaluation is not professionally employed by and has no professional employment relationship with any defendant he evaluates, competency evaluation reports are not protected by the psychologist-patient privilege.

¶95    The majority further contends that the information in a competency evaluation report is covered by the physician-patient privilege because "acquiring that information enables the evaluator to act for the defendant."  Maj. op. ¶ 38.  However, an evaluator ordered by the court to perform a competency evaluation does not "prescribe or act" for

9

the defendant, as subsection 13-90-107(1)(d) requires. Rather, in contrast to a physician who prescribes or acts to diagnose or treat his patient at his patient's behest, an evaluator acts at the court's request to assess the defendant's competency. Thus, the information in a competency evaluation report is not necessary to prescribe or act for the defendant; it is necessary to enable the evaluator to comply with the court's order and, by extension, with subsections 16-8.5-103(2), C.R.S. (2018) (discussing court-ordered competency evaluations) and 16-8.5-105(5) (explaining the required contents of competency evaluation reports).

¶96    In addition to misconstruing the plain language of subsections 13-90-107(1)(d) and (1)(g), the majority pays no attention to our decision in *Martinez* Although *Martinez* involved a medical malpractice claim, it is instructive.

¶97    Martinez was involved in a car accident, and Dr. Lewis performed an independent medical evaluation at the request of State Farm Mutual Automobile Insurance Company (State Farm), Martinez's insurer. 969 P.2d at 215–16. In analyzing whether Dr. Lewis owed Martinez a duty, we listed a number of factors that must be considered: "the risk involved," balancing "the foreseeability and likelihood of injury" against "the social utility of the [physician's] conduct," the extent of "the burden of guarding against the harm," and any "consequences of placing the burden of a duty on the defendant." *Id*. at 218. In applying these factors, we reviewed the context in which Dr. Lewis's evaluation of Martinez occurred and contrasted Martinez's health care providers with Dr. Lewis. *Id*. We explained that "Martinez sought psychological and psychiatric *treatment from her own health care providers*" and did not contend "that she

10

sought *medical advice or treatment from Dr. Lewis*, that he *advised* her in any way, that he failed to inform her about an unknown condition, or that he injured her during the course of the examination." *Id*. (emphases added). We further observed that, under State Farm's agreement with Dr. Lewis, which was for State Farm's sole benefit, "Dr. Lewis's obligations were to report to State Farm his opinions regarding the diagnosis, prognosis, and other pertinent information regarding any treatment Martinez might need." *Id*. at 218–19. Therefore, we agreed with the court of appeals that "no physician-patient relationship existed between Dr. Lewis and Martinez." *Id*. at 219.

¶98 Similarly, here, Murillo did not seek medical advice or treatment from the evaluator, and the evaluator did not advise him in any way or diagnose any condition. Moreover, pursuant to the court's order, the evaluator's obligation was to report to the court in writing the opinions and information required by subsection 16-8.5-105(5). Thus, just as no physician-patient relationship was formed between Dr. Lewis and Martinez, no physician-patient relationship or psychologist-client relationship was formed between Murillo's evaluator and Murillo.

¶99 Although the majority turns a blind eye to *Martinez*, it nevertheless reasons that competency evaluations are privileged because they are conducted largely for the defendant's benefit. I take issue with this supposition. While it is now axiomatic that it is unconstitutional to try an incompetent defendant, competency evaluations are ordered and completed for the benefit of the court (not the defendant), in order to afford the court an opportunity to make a fair and reliable determination regarding the

defendant's competency to proceed. Indeed, it is not unusual for defendants and defense counsel to object to court-ordered competency evaluations.

¶100 Lastly, I disagree that extending the aegis of the physician-patient and psychologist-client privileges to competency evaluations serves the purposes behind those privileges. The purpose of the privileges is "to enhance the effective diagnosis and treatment of illness by protecting the patient from the embarrassment and humiliation that might be caused by the . . . disclosure of information imparted . . . by the patient during the course of a consultation." *Clark v. Dist. Court*, 668 P.2d 3, 8 (Colo. 1983); *see also People v. Sisneros*, 55 P.3d 797, 800 (Colo. 2002). That purpose is in no way achieved by casting the protective net of the physician-patient and psychologist-client privileges so wide as to snare court-ordered competency evaluation reports, which must be distributed to the court, the prosecutor, and defense counsel, *see* § 16-8.5-105(4), and which are regularly discussed in open court during competency hearings, restoration hearings, jury trials, and sentencing hearings.

¶101 Yet, Zapata was improperly denied access to Murillo's competency evaluation report based on the physician-patient and the psychologist-client privileges. As a result, Zapata was forced to proceed to trial without the report, even though (1) Murillo testified as a prosecution witness against Zapata in Zapata's case, (2) Murillo was asked about and discussed the convenience store attack during his competency evaluation, (3) the prosecutor, defense counsel, and the judge in Murillo's case all received a copy of the report, (4) the prosecutor in Zapata's case had access to the report because he was the same prosecutor in Murillo's case, and (5) since the same judge presided over both

12

cases, the judge in Zapata's case, too, had access to the report. The majority's decision today ratifies this denial of access due to its mistaken interpretation of subsections 13-90-107(1)(d) and (1)(g).

## 2. Statutory Waiver

¶102 Because I do not believe the physician-patient and psychologist-client privileges apply to competency evaluation reports, I would not reach the statutory waiver issue. I address the question here, though, to express my disagreement with the majority's interpretation of subsection 16-8.5-104(1). Even if, as the majority concludes, competency evaluation reports are protected by the physician-patient and psychologist-client privileges, I would find that Zapata was nevertheless entitled to Murillo's competency evaluation report based on the waiver provision in subsection 16-8.5-104(1).

¶103 Subsection 16-8.5-104(1) states in pertinent part that, where, as here, "a defendant raises the issue of competency to proceed, . . . any claim by the defendant to confidentiality or privilege is deemed waived."[7] The legislature did not place a limit on

[7] In full, subsection 16-8.5-104(1) provides,

> When a defendant raises the issue of competency to proceed, or when the court determines that the defendant is incompetent to proceed and orders that the defendant undergo restoration treatment, any claim by the defendant to confidentiality or privilege is deemed waived, and the district attorney, the defense attorney, and the court are granted access, without written consent of the defendant or further order of the court, to:

> (a) Reports of competency evaluations, including second evaluations;

13

this waiver. Instead, it stated that *any claim* of confidentiality or privilege by the defendant *is deemed waived*.

¶104 The majority infuses a limitation into the statute: a defendant's physician-patient and psychologist-client privileges are waived "only as to the parties and the court in *that defendant's* case." Maj. op. ¶ 41. It does so based largely on what follows the waiver language in subsection (1)—"and the district attorney, the defense attorney, and the court are granted access, without written consent of the defendant or further order of the court, to" certain reports, documents, information, and the evaluator. § 16-8.5-104(1). Additionally, the majority relies on the fact that four of the remaining five subsections in the statute address disclosures to the same three recipients—the court, the prosecutor, and defense counsel in the defendant's case. Maj. op. ¶ 42.

¶105 In my view, the majority makes too much of the references in the statute to the court, the prosecutor, and defense counsel in the criminal case. Of course the legislature referred to the court, the prosecutor, and defense counsel in the criminal case; that is not at all surprising. After all, having declared there is an automatic waiver, the legislature set forth the records, documents, and information that must be made available to the

---

> (b) Information and documents relating to the competency evaluation that are created by, obtained by, reviewed by, or relied on by an evaluator performing a court-ordered evaluation; and
>
> (c) The evaluator, for the purpose of discussing the competency evaluation.

Thus, this subsection does not reference the physician-patient or psychologist-client privilege, and does not address the waiver of either privilege; rather, it forecloses "any claim by the defendant" that the court-ordered competency evaluation is confidential or privileged.

14

court and the parties in the case. There was no reason for the legislature to foresee—and there is no basis to believe that it foresaw or even thought about—the rare scenario that developed in this case involving a defendant who undergoes a court-ordered competency evaluation and then testifies on behalf of the prosecution against his codefendant in the codefendant's trial. But the omission of a provision addressing such an unusual case doesn't mean that the legislature intended to limit the waiver as the majority concludes.

¶106 Unlike the majority, I do not interpret the language used by the legislature as a deliberate limitation on the scope of the waiver. The legislature certainly did not say in the part of subsection (1) on which the majority relies that *only* the prosecutor, defense counsel, and the court *in the case in which the competency evaluation is completed* may be granted access to the listed reports, documents, and information. Nor did the legislature state in the remaining subsections of the statute that *only* the prosecutor, defense counsel, and the court *in the case in which the competency evaluation is completed* are entitled to the additional disclosures identified. Had the legislature meant to limit the scope of section 16-8.5-104 consistent with the majority's position, it could have easily done so by simply stating such a limitation.[8]

_____

[8] Notably, section 16-8-103.6, C.R.S. (2018), the waiver provision governing insanity cases, contains the type of limiting language the majority injects into subsection 16-8.5-104(1). That section provides that a defendant who places his mental condition at issue, by either pleading not guilty by reason of insanity or disclosing witnesses who may testify regarding his mental condition during a capital sentencing hearing, "waives any claim of confidentiality or privilege as to communications made by the defendant to

¶107 In short, because the legislature did not include any language limiting the scope of the waiver in subsection 16-8.5-104(1), I conclude that the waiver is not limited. Consequently, even if the physician-patient and psychologist-client privileges apply to protect Murillo's competency evaluation report, I would find that Murillo waived any claim of privilege or confidentiality as to the report.[9]

---

a physician or psychologist in the course of an examination or treatment for such mental condition for the purpose of any trial, hearing on the issue of such mental condition, or [capital] sentencing hearing." § 16-8-103.6. Subsection 13-90-107(3) then confirms that the physician-patient and psychologist-client privileges "shall not apply to physicians or psychologists eligible to testify concerning a criminal defendant's mental condition pursuant to section 16-8-103.6."

[9] Unfortunately, section 16-8.5-104 is not a paragon of clarity. (This is in no way intended as a criticism of our fellow branch of government; my goal is simply to draw attention to some statutory ambiguities.) In addition to the issues already discussed, I note that the waiver in subsection 16-8.5-104(1) purportedly applies only in two scenarios: when restoration services are ordered and when the defendant raises the question of competency. Yet, there are instances in which the court or the prosecution raises the issue of competency, but the defense agrees that a competency evaluation is appropriate. Further, the court, the prosecution, and defense counsel are entitled to receive a copy of *all* competency evaluation reports, regardless of who raised the issue of competency. § 16-8.5-105(4). If the waiver applies in situations not currently mentioned in the statute, it is unclear when it is triggered. For example, if the defendant requests and pays for an evaluation by an evaluator of his choosing (a second evaluation), does the waiver apply when the evaluation is requested, or only if the evaluation is completed and a report is submitted to the clerk of the court pursuant to subsection 16-8.5-105(4)?

## B. Res Gestae Evidence

¶108    I agree with the majority's conclusion regarding the evidence introduced by the trial court under the res gestae doctrine.[10]   Maj. op. ¶ 5.   However, the concurring opinion warrants a few observations.

¶109    First, the concurrence speculates that it is doubtful the trial court would have allowed under CRE 404(b) any evidence improperly admitted pursuant to the res gestae doctrine.  *See* Conc. op. ¶ 6 (Had the trial court analyzed this evidence pursuant to the requirements of Rule 404(b), "I doubt" it "would have permitted the prosecution to use the evidence as it did.").   In fact, the concurrence appears to surmise that all of the improperly admitted res gestae evidence was inadmissible under any other theory of relevance.  *Id*. at ¶ 4.

---

[10] In Colorado, res gestae is simply "a theory of relevance which recognizes that certain evidence is relevant because of its unique relationship to the charged crime."  *People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009).  The theory "is based on the idea that '[c]riminal occurrences do not always take place on a sterile stage,'" and that where the events leading up to the crimes charged help explain the setting in which the crimes took place, "'no error is committed by permitting the jury to view the criminal episode in the context in which it happened.'"  *People v. Galang*, 2016 COA 68, ¶ 15, 382 P.3d 1241, 1245 (quoting *People v. Lobato*, 530 P.2d 493, 496 (Colo. 1975)); *see also People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994) (Res gestae seeks "to provide the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred.").  Res gestae evidence is subject to the requirements of CRE 401 and CRE 403.  *People v. Relaford*, 2016 COA 99, ¶ 61, 409 P.3d 490, 500 ("Res gestae evidence is admissible so long as it is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice.").  Thus, contrary to the concurrence's assertion, res gestae is not a "nearly standardless concept."  Conc. op. ¶ 7.

¶110 Second, I take a moment to note that, as was the case with Mark Twain, the concurrence's report about the demise of the res gestae doctrine is greatly exaggerated. While the term "res gestae" may be losing favor, courts continue to allow res gestae evidence under a different name: "inextricably intertwined" evidence. *See* Edward J. Imwinkelried, *The Second Coming of Res Gestae*, 59 Catholic U. L. Rev. 719, 722–24 (2010); Christopher B. Mueller & Laird C. Kirkpatrick, 1 *Fed. Ev.* § 433 (4th ed., 2018) ("The modern de-Latinized expression uses the phrase 'inextricably intertwined'" instead of the "mind-numbing and elastic term 'res gestae[.]'"). And "the number of cases invoking the [inextricably intertwined] doctrine grows largely unabated" even "[d]espite [a] constant drumbeat of substantive criticism." Imwinkelried, *supra*, at 724.

¶111 Finally, the concurrence expresses "serious reservations about the continued appropriateness of the res gestae doctrine," *see* Conc. op. ¶ 1, and conveys skepticism regarding the doctrine's current usefulness, *see id*. at ¶¶ 7–9. These issues were not briefed or even raised by the parties. And, as mentioned, the majority does not resolve whether the trial court erred in admitting evidence pursuant to the res gestae doctrine. Maj. op. ¶ 5. Under these circumstances, the criticism levied against the res gestae doctrine seems premature. As the concurrence aptly acknowledges, this case is not a suitable conduit to consider whether we should continue to apply the res gestae doctrine. Conc. op. ¶ 7. Respectfully, because neither the wisdom of the doctrine's continued use nor the doctrine's present-day utility are issues before us, I believe that the most prudent course of action is to abstain from commenting on them at this time.

## III. Conclusion

¶112    For the reasons articulated in this dissent, I respectfully disagree with the majority's holding regarding the physician-patient and psychologist-client privileges and the waiver in section 16-8.5-104.  I would remand the case to the trial court with instructions to make Murillo's competency evaluation report available to Zapata and to then afford Zapata an opportunity to demonstrate that there is a reasonable probability that, had the report been disclosed to him before trial, the result of the proceeding would have been different.  *See Zoll v. People*, 2018 CO 70, ¶ 12, 425 P.3d 1120, 1125.

I am authorized to state that CHIEF JUSTICE COATS joins in this dissent.